# UNITED STATES DISTRICT COURT FOR THE
# SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| IN THE MATTER OF ) | |
| THE EXTRADITION OF ) | Case No. 2:22-mj-630 |
| MICHAEL PHILIP ATKINS ) | |
| ) | Magistrate Judge Vascura |
| ) | |

## MEMORANDUM OF EXTRADITION LAW AND REQUEST
## FOR DETENTION PENDING EXTRADITION PROCEEDINGS

The United States, in fulfilling its treaty obligations to Singapore, respectfully requests that the fugitive in this case, Michael Philip Atkins ("Atkins" or "the fugitive"), be held without bond pending the hearing on the certification of his extraditability pursuant to 18 U.S.C. §§ 3181 *et seq*. This memorandum summarizes the framework of extradition law in the United States and sets forth the reasons why Atkins should be detained. In short, Atkins should be detained because he cannot overcome the strong presumption against bail in international extradition cases. Specifically, he cannot meet his burden of showing that he is not a flight risk and that special circumstances warrant his release.

## BACKGROUND

Singapore seeks Atkins' extradition so that he can be prosecuted for the crime of carrying on a of a business for a fraudulent purpose, in violation of Article 340(5) of the Companies Act (Chapter 50), Statutes of the Republic of Singapore ("Companies Act"). In connection with these charges, Josephine Kang, District Judge in the State Courts of Singapore, issued a warrant for Atkins' arrest on June 21, 2017. Singapore has presented the following facts as the basis for the warrant:

Overview of Atkins' Scheme to Defraud Investors

From 2013 to 2014, Atkins was one of three Directors and the majority shareholder of Aureus Capital ("Aureus") in Singapore. Atkins used Aureus to carry out an alleged "Ponzi" scheme to defraud investors of approximately $4,000,000[1] who invested with Aureus for foreign exchange trading services. Atkins was the sole person authorized to trade using the trading accounts of Aureus with OANDA Asia Pacific Pte Ltd (OANDA), a company that offers foreign exchange trading services to clients worldwide. OANDA holds a Capital Markets Services License issued by Monetary Authority of Singapore.

Aureus operated in Singapore during the period between April 2013 and June 2014. To carry out the fraudulent scheme during this time frame, Atkins, through Aureus, offered members of the public leveraged foreign exchange trading services in return for a share of the profits from the trades. Aureus advertised on its website that funds deposited for investing would be used for investing after deducting a bank transfer fee of Singapore $40 (hereafter denominations in Singapore dollars are represented as S$). Aureus promised that clients would receive a confirmation email after each transfer to the OANDA broker for investment of the funds. Pursuant to the agreements with its clients, Aureus would be entitled to 40% to 50% of the profits, while the losses would be fully borne by the clients. Aureus falsely represented on its website that the clients' funds would be wholly transferred to a broker firm for trading after the deduction of the bank transfer fee, and Aureus would then manage the funds of these clients through trading.

Aureus' investors were required to sign an agreement in which they agreed to transfer

---

[1] All currency denominations are in U.S. dollars unless otherwise indicated as being in Singapore dollars.

their funds to Aureus' bank account at DBS Bank, Ltd. in Singapore and were provided instructions on how to do so. Upon receipt of the funds, Atkins, through emails and weekly statements to clients from Aureus, falsely represented that the clients' funds had been wholly transferred to a broker firm for foreign exchange trading after deduction of the bank transfer fee of S$40. In reality, only a small portion of the funds Aureus received from clients were transferred to a broker firm for foreign exchange trading.

CAD investigation of Atkins' fraudulent scheme

Beginning from early July 2014, the Commercial Affairs Division ("CAD") of the Singapore Police Force ("SPF") began receiving complaints from Aureus clients' that they could not withdraw the money they had invested with the company. Ultimately, 285 clients reported to CAD that they had been defrauded by Aureus. These clients were from various countries, including Singapore, the Philippines, and the United States, among others. As part of its ensuing investigation, CAD analyzed Aureus' financial records during the relevant time period and determined that Aureus' statements regarding the transfer of clients' funds to OANDA were false.

The investigation revealed that between 1 April 2013 and 30 June 2014, Aureus Capital received deposits from investors in its DBS bank account amounting to S$19,646,590.62. Of this amount, an estimated sum of S$18,275,704.81 (US$14,608,876.70 based on exchange rate of US$1: S$1.251), or 93% of the deposits, was believed to have been monies collected from its clients. Of this total amount, only S$1,649,793.08 were transferred to OANDA for the purposes of leveraged foreign exchange trading. A significant portion of the monies Aureus collected from its clients was expended in payments to clients as withdrawals, transfers to non-client third parties, or payments to Atkins and one of the other directors of Aureus. This was in direct

contradiction to Aureus' representation that all funds received from the clients (less a S$40 bank transfer fee) would be used for trading.

The financial records obtained by CAD show that, aside from the S$1,649,793.08 used for investing with OANDA, S$8,955,888.04 was returned to clients requesting withdrawals and S$4,541,882.88 was transferred from Aureus' DBS bank account to non-client third parties in Indonesia, Hong Kong, the United States, Canada, Nigeria, and the Philippines. Mary K. Atkins was a non-client third-party recipient of S$12,347.40 these funds. The third-party entities receiving funds from Aureus were not included among Aureus' list of customers. These actions contradict the representations made by Atkins and Aureus to investors, which were described on Aureus' website and in contractual agreements signed by the clients.

An examination of the money that was transferred from Aureus' DBS account to OANDA showed a loss for the entire period of May 2013 to June 2014, which amounted to a loss of S$321,900.21. However, weekly statements sent to clients by Atkins falsely showed profits were being generated. For example, records from OANDA showed that on April 8, 2014, Aureus' trades in foreign currency showed losses, whereas a weekly statement from the same time period showed a profit. Similar fabrications of foreign currency trades showed profits on May 6, 2014, and May 9, 2014, when in fact OANDA's records showed losses. Indeed, statements obtained from OANDA showed that from May 2014 to June 2014, there were total losses of S$1.98 million, with no profits being made by Aureus. This means that the withdrawals of $7,593,002.23 ($8,955,888.04 less $1,362,885.81) were not funded by the monies from the OANDA trading account. The investigation revealed that Aureus had no other sources of revenue and that 93% of the total inflows to Aureus' bank account came from clients, which meant the sums returned to clients requesting withdrawals originated from the overall pool of

clients' monies.

Atkins was arrested by Singaporean authorities in July 2014, and he was subsequently interviewed on numerous occasions by CAD Officer Sherlene Tan ("Tan") that same month. During those interviews, Atkins admitted that the other two directors of Aureus managed client support while he was the sole person in charge of trading clients' funds. Atkins stated he exclusively decided on the trades with OANDA. Atkins further admitted he was the one who manually calculated the daily profit and losses arising from the trades and input the data into the program used to generate the weekly trading statements for clients. Atkins claimed that Aureus' bank account was emptied because approximately S$1 million was paid back to approximately 200 clients who had asked to withdraw their investments. When asked about the remaining clients, Atkins claimed that he was in the process of borrowing money to return their investments. Atkins admitted that he owed to Aureus' clients approximately US$15 million as of 17 July 2014. He claimed this deficit was due to accumulated trading losses over a period of time. However, records obtained by CAD showed that only approximately S$1.65 million was used for trading.

Atkins Absconds from Singapore

After Atkins was arrested by CAD on July 17, 2014, he was released on police bail of S$15,000 and his U.S. passport, number 488056427, was impounded as a condition of bail. Kent Tey Eng Ann ("Tey") posted bail for Atkins. On July 31, 2014, Tey drove Atkins to CAD for renewal of bail and that was the last time that Tey saw Atkins. Subsequently, Atkins made various excuses not to meet Tey and refused to provide his latest residential address to Tey. Tey's last communication with Atkins was a text message from Atkins on August 5, 2014.

According to CAD's investigation, the Immigration & Checkpoints Authority of

5

Singapore had no record of Atkins leaving the country. In November 2014, CAD received an anonymous tip that Atkins was in possession of a new passport with the number 505849773. In February 2015, the U.S. Embassy in Singapore confirmed that the new passport was issued to Atkins from the U.S. Embassy in Jakarta on August 18, 2014, after he had applied for a new passport there. According to the U.S. Embassy, Atkins applied for a new passport by claiming that he had lost his previous one. However, his passport was still in the custody of the Singaporean authorities at the time.

Accordingly, Singapore has requested that Atkins be extradited pursuant to its extradition treaty with the United States (the "Treaty").[2] The United States, in accordance with its obligations under the Treaty and pursuant to 18 U.S.C. §§ 3181 *et seq.*, filed a complaint in this District seeking a warrant for Atkins' arrest. This Court issued the arrest warrant, and Atkins was arrested on Tuesday, September 27, 2020. Atkins is currently in the custody of the U.S. Marshals Service.

## ARGUMENT

## I. LEGAL FRAMEWORK OF EXTRADITION PROCEEDINGS

### A. The limited role of the Court in extradition proceedings

The extradition process is *sui generis*. Extradition is primarily an executive function with a specially defined role for the Court, which is authorized by statute to hold a hearing at which it determines whether to certify to the Secretary of State that the evidence provided by the requesting country is "sufficient to sustain the charge." 18 U.S.C. § 3184. The Secretary of

---

[2] Treaty on Extradition Between the United States of America and Great Britain, U.S.-U.K., Dec. 22, 1931, 47 Stat. 2122, continued in force by Continued Application to Singapore of the United States-United Kingdom Treaty of December 22, 1931, U.S.-Sing., Apr. 23, 1969, 20 U.S.T. 2764.

State, not the Court, then decides whether the fugitive should be surrendered to the requesting country.  18 U.S.C. §§ 3184, 3186; *Martinez v. United States*, 828 F.3d 451, 455 (6th Cir. 2016) (en banc); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 584 (6th Cir. 1985), *vacated on other grounds*, 10 F.3d 338 (6th Cir. 1993); *In re Extradition of Bilanovic*, No. 1:08-mj-74, 2008 WL 5111846, at *4 (W.D. Mich. Dec 3, 2008) ("Extradition is an executive rather than a judicial function."). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch."  *United States v. Kin-Hong*, 110 F.3d 103, 110 (1st Cir. 1997).

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established.  *Charlton v. Kelly*, 229 U.S. 447, 461 (1913) (analogizing extradition hearing to a preliminary hearing in a criminal case); *see also In re Extradition of Drayer*, 190 F.3d 410, 415 (6th Cir. 1999) ("An extradition proceeding is not a forum in which to establish[] the guilt or innocence of the accused; rather, the sole inquiry is into probable cause.").  If the Court finds that the requirements for certification have been met, it must provide the certification to the Secretary of State, together with a copy of any testimony taken before the Court, and commit the fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding surrender.  18 U.S.C. § 3184 (following certification, the extradition judge "shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made").

7

B.   **The requirements for certification**

The Court should certify to the Secretary of State that a fugitive is extraditable when the following requirements have been met: (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the Court has jurisdiction over the fugitive; (3) the applicable extradition treaty is in full force and effect; (4) the crimes for which surrender is requested are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause as to each charge. *See In re Extradition of Robinson*, No. 3:11-mj-7047, 2011 WL 6072102, at *1 (N.D. Ohio Oct. 21, 2011) (citing *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925)). The following sections briefly discuss each of those requirements.

1.   Authority over the proceedings

The extradition statute authorizes proceedings to be conducted by "any justice or judge of the United States, or any magistrate judge authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State." 18 U.S.C. § 3184. As such, the judicial officer conducting the extradition hearing that Section 3184 prescribes does not exercise "any part of the judicial power of the United States," but, rather, acts in a "non-institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d 1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate judges and district judges may render a certification under Section 3184. *See Austin v. Healey*, 5 F.3d 598, 601-02 (2d Cir. 1993); *see also In re Extradition of Harusha*, No. 07-x-51072, 2008 WL 1701428, at *2 (E.D. Mich. Apr. 9, 2008).

2.   Jurisdiction over the fugitive

The Court has jurisdiction over a fugitive, such as Atkins, who is found within its jurisdictional boundaries. 18 U.S.C. § 3184 ("[A judge] may, upon complaint made under oath,

charging any person found within his jurisdiction . . . issue his warrant for the apprehension of the person so charged.").

### 3. Treaty in full force and effect

Section 3184 provides for extradition in specifically defined situations, including whenever a treaty or convention for extradition is in force between the United States and the requesting state. *See id.*; *see also Then v. Melendez*, 92 F.3d 851, 853 (9th Cir. 1996) (noting that "the executive branch does not have the power to extradite alleged criminals absent a valid extradition treaty"). The government will satisfy this requirement at the extradition hearing by offering into evidence a declaration from an attorney in the Office of the Legal Adviser for the U.S. Department of State, attesting that there is a treaty in full force and effect between the United States and Singapore. The Court should defer to the Department of State's determination in that regard. *See, e.g., Then*, 92 F.3d 851 at 854; *Sayne v. Shipley*, 418 F.2d 679, 684 (5th Cir. 1969); *United States v. Struga*, 231 F. Supp. 3d 244, 250–51 (E.D. Mich. 2017) (citing *Terlinden v. Ames*, 184 U.S. 270, 288 (1902); *Kastnerova v. United States*, 365 F.3d 980, 985–87 (11th Cir. 2004)).

### 4. Crimes covered by the treaty

Extradition treaties create an obligation for the United States to surrender fugitives under the circumstances defined in the treaty. Article 1 of the Treaty provides for the return of fugitives who have been accused or convicted of an offense enumerated in Article 3 of the Treaty and that is committed within the territory of the requesting country. Article 3 of the Treaty contains a list of offenses that are extraditable. Relevant here, the list of extraditable crimes includes "Fraud by a bailee, banker, agent, factor, trustee, director, member, or public officer of

any company, or fraudulent conversion" and "Obtaining money, valuable security, or other property, knowing the same to have been stolen or unlawfully obtained."

In assessing whether the crime for which extradition is requested is covered by the Treaty, the Court should examine the description of criminal conduct provided by Singapore in support of its charge and decide whether that conduct constitutes an offense among those listed in Article 3. *Factor v. Laubenheimer*, 290 U.S. 276, 299-300 (1933). An offense is "extraditable," regardless of whether it is expressly designated on the Treaty's list, so long as the underlying conduct constitutes one of the enumerated offenses. *See*, *e.g.*, *id.*; *Artukovic v. Rison*, 784 F.2d 1354, 1356 (9th Cir. 1986) (treaty that listed "murder" as extraditable encompassed offenses charged as "war crimes"). In determining whether the conduct constitutes an enumerated offense, "a narrow and restricted construction is to be avoided . . . [and] if a treaty fairly admits of two constructions, one restricting the rights which may be claimed under it, and the other enlarging it, the more liberal construction is to be preferred." *Factor*, 290 U.S. at 293-94. Accordingly, because extradition treaties should be "interpreted with a view to fulfil our just obligations to other powers," *Grin v. Shine*, 187 U.S. 181, 184 (1902), the Court should "interpret extradition treaties to produce reciprocity between, and expanded rights on behalf of, the signatories." *Martinez*, 828 F.3d at 463 ("The point of an extradition treaty after all is to facilitate extradition . . .").

5. Probable cause that the fugitive has committed the offenses

To certify the evidence to the Secretary of State, the Court must conclude there is probable cause to believe that the crime charged by Singapore was committed by the person before the Court. *Demjanjuk*, 776 F.2d at 576; *see also Robinson*, 2011 WL 6072102, at *3 ("The probable cause standard applicable to an extradition hearing is the same as the standard

used in federal preliminary hearings.") (citing *Hoxha v. Levi*, 465 F.3d 554, 561 (3d Cir. 2006)). The evidence is sufficient, and probable cause is established, if it would cause a "prudent man" to "believ[e] that the (suspect) had committed or was committing an offense." *Gerstein v. Pugh*, 420 U.S. 103, 111 (1975) (internal quotation marks and citation omitted). The extradition judge's probable cause determination is "not a finding of fact 'in the sense that the court has weighed the evidence and resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342 n.10 (9th Cir. 1981)).

### C. An extradition hearing follows unique procedures

As detailed above, the purpose of an extradition hearing is to decide the sufficiency of each charge for which extradition is requested under the applicable extradition treaty; it is not to determine the guilt or innocence of the fugitive—that determination is reserved for the foreign court. *Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Accordingly, an extradition hearing is not a criminal proceeding, and special procedures apply. *See, e.g.*, *Martinez*, 828 F.3d at 455.

The Federal Rules of Evidence do not apply to extradition proceedings. *See* Fed. R. Evid. 1101(d)(3) ("These rules—except for those on privilege—do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *see, e.g.*, *Harusha*, 2008 WL 1701428, at *3. Hearsay evidence is admissible at an extradition hearing, and, moreover, a certification of extraditability is properly based entirely on the authenticated documentary evidence and information provided by the requesting government. *See, e.g.*, *Collins*, 259 U.S. at 317; *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th Cir. 1977). Nothing more is required, and

11

typically nothing more is provided. *See, e.g.*, *Demjanjuk*, 776 F.2d at 576 (documentary evidence identifying the fugitive as a guard at an SS training camp is competent evidence); *Harusha*, 2008 WL 1701428, at *4 ("hearsay is permitted and admissible"). Extradition treaties do not require, or even anticipate, the testimony of live witnesses at the hearing. *Yordi v. Nolte*, 215 U.S. 227, 231 (1909). Indeed, requiring the "demanding government to send its citizens to another country to institute legal proceedings, would defeat the whole object of the treaty." *Bingham v. Bradley*, 241 U.S. 511, 517 (1916).

The Federal Rules of Criminal Procedure also do not apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); *see*, *e.g.*, *Harusha*, 2008 WL 1701428, at *3. Moreover, the fugitive has no right to discovery, s*ee Prasoprat v. Benov*, 421 F.3d 1009, 1014 (9th Cir. 2005); *Montemayor Seguy v. United States*, 329 F. Supp. 2d 883, 889 (S.D. Tex. 2004), except in very limited circumstances, *see Demjanjuk v. Petrovsky*, 10 F.3d 338, 353-54 (6th Cir. 1993) (applying *Brady v. Maryland*, 373 U.S. 83 (1963), to the facts of that extradition case, where the United States had conducted its own investigation of the offense underlying the extradition request); *Drayer*, 190 F.3d at 413-15 (holding that the United States fulfilled its discovery obligations by turning over materials in its possession, and that any items "that may be in the possession of Canada must be sought in a Canadian forum"); *Martinez*, 828 F.3d at 470 (finding government's discovery obligations satisfied by its representation that there was no exculpatory evidence in its possession) (citing *Drayer*, 190 F.3d at 415).

Furthermore, many constitutional protections applicable in criminal cases do not apply. For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing, *see*, *e.g.*, *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988); there is no Sixth

Amendment right to a speedy trial, *see, e.g.*, *Martinez*, 828 F.3d at 457-465; the Fifth Amendment guarantee against double jeopardy does not apply to successive extradition proceedings, *see, Lo Duca v. United States*, 93 F.3d 1100, 1104 (2d Cir. 1996) (citing *Collins v. Loisel*, 262 U.S. 426, 429 (1923)); the exclusionary rule is not applicable, *see, e.g.*, *Simmons v. Braun*, 627 F.2d 635, 636-37 (2d Cir. 1980); and a fugitive does not have the right to confront his accusers, *see, e.g.*, *Bingham*, 241 U.S. at 517.

Relatedly, a fugitive's right to present evidence is severely constrained. A fugitive may not introduce evidence that contradicts the evidence submitted on behalf of the requesting country, but rather may only introduce evidence explaining the submitted evidence. *See Charlton*, 229 U.S. at 461-62; *Hoxha*, 465 F.3d at 561; *In re Extradition of Hasani*, No. 2:14-mj-189, 2014 WL 4549232, *3 (S.D. Ohio Sept. 12, 2014) ("[O]nly evidence that explains the evidence submitted in support of extradition is admissible"); *In re Extradition of Basic*, No. 5:11-mj-5002, 2012 WL 3067466, at *2 (E.D. Ky. July 27, 2012). A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter." *Collins*, 259 U.S. at 316 (citation omitted). Whether to admit explanatory evidence is largely within the court's discretion. *See In re Demjanjuk*, 603 F. Supp. 1463, 1465 (N.D. Ohio 1984) (citing *Hooker v. Klein*, 573 F.2d 1360, 1369 (9th Cir. 1978) and *Collins*, 259 U.S. at 317).

In addition, courts routinely reject technical and affirmative defenses in extradition proceedings. *See, e.g.*, *Bingham*, 241 U.S. at 517 (rejecting objections to extradition that "savor of technicality"); *Harusha*, 2008 WL 1701428, at *5 ("[A]ffirmative defenses, including self-defense, are not relevant in extradition hearings and should not be considered) (citing *Charlton*,

229 U.S. at 462). These issues, which require factual or credibility determinations, are reserved for the courts in the requesting country to resolve after the fugitive is extradited.

### D. Rule of non-inquiry

All matters a fugitive may raise as a defense to extradition, other than those related to the requirements for certification, are to be considered by the Secretary of State, not by the Court. *See* 18 U.S.C. §§ 3184, 3186; *see also Hasani*, 2014 WL 4549232, at * 2. The Secretary of State takes into account humanitarian claims and applicable statutes, treaties, or policies regarding appropriate treatment in the requesting country. *See Mironescu v. Costner*, 480 F.3d 664, 666 (4th Cir. 2007); *see also Jhirad v. Ferrandina*, 536 F.2d 478, 484-85 (2d Cir. 1976) ("It is not the business of our courts to assume the responsibility for supervising the integrity of the judicial system of another sovereign nation."). Additionally, the Secretary of State should consider a fugitive's contentions that an extradition request is politically motivated, that the requesting state's justice system is unfair, or that extradition should be denied on humanitarian grounds. *Harusha*, 2008 WL 1701428, at *5; *Prasoprat v. Benov*, 421 F.3d 1009, 1016 (9th Cir. 2005) (extradition judge does not have authority to consider humanitarian objections to extradition); *Koskotas v. Roche*, 931 F.2d 169, 173-74 (1st Cir. 1991) (motives of requesting state is a matter for consideration by the executive branch). This practice is consistent with the long-held understanding that the surrender of a fugitive to a foreign government is "purely a national act . . . performed through the Secretary of State." *In re Kaine*, 55 U.S. 103, 110 (1852).

## II. ATKINS SHOULD BE DETAINED

Just as extradition proceedings follow unique procedures, the determination of whether to release a fugitive on bail is also *sui generis*. The federal statutes governing extradition in the

United States, 18 U.S.C. §§ 3181 *et seq.*, do not provide for bail. Further, the Bail Reform Act, 18 U.S.C. §§ 3141 *et seq.*, does not apply because, as explained above, an extradition proceeding is not a criminal case.³ *See*, *e.g.*, *Matter of Extradition of Kozeluh*, 3:21-mj-2231, 2022 WL 413990, at *2 (E.D. Tenn. Feb. 9, 2022); *In re Extradition of Nagy*, No. 1:17-mj-3283, 2017 WL 6558487, at *3 (N.D. Ohio Dec. 21, 2017); *United States v. Hills*, 765 F. Supp. 381, 385 n.5 (E.D. Mich. 1991). Rather, case law provides that bail should be granted in an extradition proceeding "only in the most pressing circumstances, and when the requirements of justice are absolutely peremptory." *United States v. Leitner*, 784 F.2d 159, 160 (2d Cir. 1986) (quoting *In re Mitchell*, 171 F. 289, 289 (S.D.N.Y. 1909) (Hand, J.)); *see Hills*, 765 F. Supp. at 385 ("Admission to bail [in extradition matters] should be in practice an unusual and extraordinary thing, and [the] court should exercise the power very sparingly and only when the justification is pressing as well as plain.") (internal quotation marks and citation omitted).

### A. Applicable law

#### 1. A Strong Presumption Against Bail Governs in an International Extradition Proceeding

Unlike in domestic criminal cases, there is a "presumption against bail" in international extradition cases. *Kozeluh*, 2022 WL 413990, at *2; *Nagy*, 2017 WL 6558487, at *3 (citations omitted); *Hills*, 765 F. Supp. at 384-85; *see In re Extradition of Heilbronn*, 773 F. Supp. 1576, 1578 (W.D. Mich. 1991) (noting that in extradition cases, "the presumption rests against bail"). The Supreme Court established this presumption against bail in *Wright v. Henkel*, explaining that

---

³ The Bail Reform Act applies only to "offenses" in violation of U.S. law that are triable in U.S. courts. *See* 18 U.S.C. §§ 3141(a), 3142, 3156(a)(2). Here, Atkins is not charged with an "offense" within the meaning of 18 U.S.C. § 3156, but rather with offenses committed in violation of the law of the requesting state, Singapore.

15

when a foreign government makes a proper request pursuant to a valid extradition treaty, the United States is obligated to deliver the person sought after he or she is apprehended:

> The demanding government, when it has done all that the treaty and the law require it to do, is entitled to the delivery of the accused on the issue of the proper warrant, and the other government is under obligation to make the surrender; an obligation which it might be impossible to fulfill if release on bail were permitted. The enforcement of the bond, if forfeited, would hardly meet the international demand; and the regaining of the custody of the accused obviously would be surrounded with serious embarrassment.

190 U.S. 40, 62 (1903).

The presumption exists because when, as here, a requesting country meets the conditions of the Treaty, the United States has an "overriding foreign relations interest in complying with treaty obligations" to deliver the fugitive. *Hills*, 765 F. Supp. at 384-85; *see also Wright*, 190 U.S. at 62; *Kozeluh*, 2022 WL 413990, at *3. It is important that the United States be regarded in the international community as a country that honors its agreements in order to be in a position to demand that other nations meet their reciprocal obligations to the United States. Such reciprocity would be defeated if a fugitive flees after being released on bond.

> 2. <u>Fugitives must be detained unless they establish "special circumstances" and also demonstrate that they are neither a flight risk nor a danger to the community</u>

In light of the strong presumption against bail established in *Wright*, fugitives may not be released on bail unless they demonstrate that (1) they are neither a flight risk nor a danger to the community, *and* (2) "special circumstances" warrant their release. *See, e.g.*, *In re Extradition of Martinez*, No. 13-6027, 2013 U.S. App. LEXIS 26256, at *4 (6th Cir. Oct. 8, 2013) (affirming detention order where district court found that fugitive was not a flight risk and no special circumstances justified his release). "This 'special circumstances' standard is much stricter than the 'reasonable assurance' of appearance standard made applicable to domestic criminal

16

proceedings by the Bail Reform Act." *Hills*, 765 F. Supp. at 384-85 ("[O]nly the existence of 'special circumstances' will warrant bail in extradition cases.").

In evaluating a fugitive's risk of flight in the extradition context, courts have considered, among other things, the fugitive's financial means, ties with foreign countries, and incentive to flee based on the severity of the offense. *See, e.g.*, *In re Extradition of Beresford-Redman*, 753 F. Supp. 2d 1078, 1091 (C.D. Cal. 2010) (finding that a "well-educated and sophisticated" fugitive facing serious charges in foreign country had both the "incentive and ability to flee" and therefore presented a flight risk); *Heilbronn*, 773 F. Supp. at 1581 (considering that fugitive, a multilingual medical doctor, could practice medicine in many countries and thus presented a flight risk). Crucially, the special circumstances inquiry is separate from considerations of danger to the community or risk of flight. *See, e.g.*, *Nagy*, 2017 WL 6558487, at *3 (stating that special circumstances do not include, standing alone, the fact that the fugitive is considered a so-called "tolerable bail risk") (citations omitted); *Hills*, 765 F. Supp. at 386 ("'[A]bsence of risk of flight' is *not* a legally cognizable 'special circumstance' to justify release on bail in extradition cases."). Accordingly, a fugitive who poses a danger to the community or a risk of flight should be denied bail, even in the face of special circumstances. *Heilbronn*, 773 F. Supp. at 1582 (denying bail where fugitive willfully had disregarded his court obligations in Israel).

"Special circumstances are limited to situations in which the justification [for release] is pressing as well as plain." *Martinez*, 2013 U.S. App. LEXIS 26256, at *4 (quoting *United States v. Kin-Hong*, 83 F.3d 523, 524 (1st Cir. 1996)). Courts have considered and rejected a lengthy list of would-be special circumstances, including:

- The complexity of the pending litigation, *see, e.g.*, *Kin-Hong*, 83 F.3d at 525; *United States v. Tang Yee-Chun*, 657 F. Supp. 1270, 1271–72 (S.D.N.Y. 1987);

17

- The fugitive's need to consult with an attorney or participate in pending litigation, *see, e.g.*, *Hills*, 765 F. Supp. at 387;

- The fugitive's character, background, or ties to the community, *see, e.g.*, *Nagy*, 2017 WL 6558487, at *4; *Beresford-Redman*, 753 F. Supp. 2d at 1089; *Heilbronn*, 773 F. Supp. at 1581-82;

- The fact that the fugitive may have been living openly, *see, e.g.*, *Leitner*, 784 F.2d at 160-61; *In re Extradition of Pelletier*, No. 09-mc-22416, 2009 WL 3837660, at *1, 3-4 (S.D. Fla. Nov. 16, 2009);

- Discomfort, special dietary needs, or medical concerns that can be attended to while incarcerated, *see, e.g.*, *In re Extradition of Lagadec*, 386 F. Supp. 3d 629, 630 (E.D.N.C. 2019); *In re Extradition of Martinelli Berrocal*, 263 F. Supp. 3d 1280, 1301-02 (S.D. Fla. 2017); *Nezirovic v. Holt*, 990 F. Supp. 2d 594, 602 (W.D. Va. 2013); *In re the Extradition of Kyung Joon Kim*, 04-cv-3886, 2004 WL 5782517, at *5 (C.D. Cal. July 1, 2004);

- U.S. citizenship or the pendency of naturalization or other immigration proceedings, *see, e.g.*, *Matter of Extradition of Carr*, 20-CR-370, 2020 WL 4816052, at *6 (N.D. Ill. Aug. 18, 2020); *In re Extradition of Antonowicz*, No. CV-17-00861, 2017 WL 1197855, at *4 (C.D. Cal. Mar. 27, 2017); *In re Extradition of Sacirbegovic*, 280 F. Supp. 2d 81, 84 (S.D.N.Y. 2003); *In re Extradition of Orozco*, 268 F. Supp. 2d 1115, 1117 (D. Ariz. 2003);

- The fugitive's professional status, *see, e.g.*, *Pelletier*, 2009 WL 3837660, at *3-4 (allegedly well-respected businessman); *Heilbronn*, 773 F. Supp. at 1581-82 (highly-trained doctor);

- The availability of electronic monitoring, *see, e.g.*, *In re Extradition of Rovelli*, 977 F. Supp. 566, 569 (D. Conn. 1997);

- Ordinary delay or delay occasioned by the fugitive in the course of extradition proceedings, *see, e.g.*, *Nagy*, 2017 WL 6558487, at *4 (fugitive "cannot complain of the passage of time when he has been a part of the reason the time has passed"); *Martinelli Berrocal*, 263 F. Supp. 3d at 1297-98; *Antonowicz*, 2017 WL 1197855, at *3; and

- The availability of bail for the same offense in the requesting country, *see, e.g.*, *Martinelli Berrocal*, 263 F. Supp. 3d at 1298-99; *Antonowicz*, 2017 WL 1197855, at *3; *In re Extradition of Garcia*, 615 F. Supp. 2d 162, 172 (S.D.N.Y. 2009); *In re Extradition of Siegmund*, 887 F. Supp. 1383, 1386–87 (D. Nev. 1995).

While in certain exceptional cases some of the above may have been deemed a special circumstance, courts generally determine special circumstances to exist based on a confluence of

factors, as opposed to any single consideration.  Such findings are highly case-specific and within the discretion of the Court, mindful of the strong presumption against bail and future reciprocity of other countries at stake.

**B.     Analysis**

The Court should detain Atkins without bond because he is a significant flight risk.  Indeed, Atkins' past behavior shows that he is likely to flee if he were released on bond.  After Atkins was arrested, interviewed on multiple occasions about his alleged criminal activities, and released on bail on condition of submitting his U.S. passport to Singaporean authorities, he fled Singapore and went to Jakarta, Indonesia.  In Jakarta, Akins applied for and obtained a new passport at the U.S. Embassy by falsely claiming that he had lost his previous passport.  He then used that passport to return to the United States.  The fact that Atkins attempted to evade prosecution by fleeing the country that seeks to prosecute him is highly indicative of his risk of flight were he to be released on bond here.  *Cf. United States v. Botero*, 604 F. Supp. 1028, 1035 (S.D. Fla. 1985) ("In the context of determining whether a defendant poses a substantial risk of flight, this Court does not find any meaningful distinction between a person who left the country when he learned of pending charges and one who already outside the country refuses to return to face these charges.  The intent is the same—the avoidance of prosecution.") (citing *Jhirad*, 536 F.2d at 483).

Additionally, the strength of Singapore's case, the government's relatively low burden of proof in extradition hearings, and the prospect of serving a significant prison sentence in Singapore, provide Atkins with a significant incentive to flee.  *See*, *e.g.*, *In re Extradition of Adame*, 2013 WL 1222115, at *3  (S.D. Tex. Mar. 25, 2013) (the fugitive "has virtually no incentive to appear at his extradition hearing, where, due to the Government's low burden of

proof, there is a significant risk that he will be formally extradited to Mexico"); *see also*, *e.g.*, *In re Extradition of Shaw*, 14-mc-81475-WM, 2015 WL 521183, at *9 (S.D. Fla. Feb. 6, 2015) ("[T]he Defendant is facing serious criminal sanctions in Thailand, which fact provides him with a strong incentive to flee."). Thus, given the stakes and Atkins' prior escape from Singapore, no amount of bail would be sufficient to guarantee his continued presence in these proceedings.

Atkins' risk of flight is a sufficient ground for the Court to deny any forthcoming application for bail. However, even if the Court were satisfied that Atkins is not a flight risk, the government is unaware of any "special circumstances" that would justify bail in this case. Should, however, the Court be inclined to grant bail in this case, the government respectfully requests that the Court submit special written findings as to those specific matters that are found to constitute "special circumstances." Moreover, in order to protect the ability of the United States to meet its treaty obligations to Singapore, the government also requests that the Court notify the parties within a reasonable amount of time in advance of any contemplated release order.

### III. CONCLUSION

For the foregoing reasons, the United States requests that Atkins be detained pending resolution of this extradition proceeding.

Dated: September 27, 2022

Respectfully submitted,

KENNETH L. PARKER

United States Attorney

By:

s/ *Heather A Hill*
HEATHER A. HILL
Assistant United States Attorney