IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| IN THE MATTER OF | ) | CASE NO. 2:22-mj-630 |
| THE EXTRADITION OF | ) | |
| MICHAEL PHILIP ATKINS | ) | MAGISTRATE JUDGE JOLSON |
| | ) | |
| | ) | |

**MEMORANDUM OF EXTRADITION LAW IN SUPPORT OF
RELEASE PENDING EXTRADITION PROCEEDINGS**

Now comes Michael Atkins, through the undersigned counsel, and respectfully requests that this Court set reasonable conditions of release during the pendency of these extradition proceedings.

**I.      PROCEDURAL POSTURE**

The United States is seeking Atkins's extradition to the Republic of Singapore ("Singapore") for alleged fraudulent violations of Article 340(5) of the Companies Act pursuant to a purported treaty between the United States and the United Kingdom of December 22, 1931 that was extended to Singapore by exchange of letters between the countries in 1969. 20 U.S.T. 2764.[1]

Singapore initially sought Atkins's extradition pursuant to a diplomatic request made to the U.S. Embassy in Singapore on June 8, 2020. Document 1-2, PAGEID # 24. Despite certifying Singapore's request on June 11, 2020, the United States appears to have taken no action. Document 1-2, PAGEID # 25. Singapore supplemented its request with the U.S. Embassy in Singapore on February 11, 2022 and the Embassy certified the supplement on April 7, 2022. Document 1-8, PAGEID # 1417-27. The United States initiated proceedings in this Court on

---

[1] It is ultimately incumbent upon the United States to establish that an applicable extradition treaty is in full force and effect with Singapore. *In re Extradition of Robinson*, NO. 3-11-mj-7047, 2011 WL 6072102, at *1 (N.D. Ohio Oct. 21, 2011)(citations omitted)

September 21, 2022 through its filing of a Verified Extradition Complaint together with request for an arrest warrant. The Court issued the arrest warrant that same day.  At a preliminary proceeding held following his arrest on September 27, 2022, Magistrate Judge Vascura ordered Atkins detained indefinitely pending the scheduling of a hearing for a date to be determined.  The Court thereafter set a detention hearing at the request of the parties for October 20, 2022.

## II.     LAW & ARGUMENT

The United States has argued in its Extradition Memorandum that Atkins should be detained during the pendency of these proceedings for a variety of reasons and asserts that federal statutes do not provide for bail.  Yet in 1903, the Supreme Court recognized that courts *do* have the power to grant bail. *Wright v. Hekel*, 190 U.S. 40 (1903).  While it cautioned that they should exercise that power carefully because of the risk of diplomatic embarrassment if the target absconds, it indicated that courts can grant bail if the "special circumstances" of the individual case warrant release by sufficiently minimizing that risk.

Since then, courts have interpreted *Wright* as creating a presumption against bail absent a showing of special circumstances. *In re Extradition of Martinez*, No. 13-6027, 2013 U.S. App. LEXIS 26256, at *4 (6th Cir. Oct. 8, 2013).   In addition to establishing special circumstances, an extradition target must also show that they will not flee or pose a danger to any other person or to the community. *Matter of Extradition of Nacif-Borge*, 829 F. Supp 1210, 1215 (D. Nev. 1993).  "The term 'special circumstances' is one that has eluded judicial definition and there is an absence of any bright line parameters to it." *In re Extradition of Molner*, 182 F. Supp. 2d 684, 688 (N.D. Ill. 2002).  The cumulation of several factors can constitute special circumstances that justify bail in extradition proceedings. *Nacif-Broge,* 829 F. Supp at 1216.  Consideration of "special circumstances" is likewise not limited to those that have been previously recognized.

*Beaulieu v. Hartigan*, 554 F.2d 1, 1 (1st Cir. 1977).   And though "the Bail Reform Act does not govern, the statute provides general guidelines for courts to evaluate a potential bailee's risk of flight and dangerousness to the community." *Basic v. Carl*, No. 5:12-274 KKC (E.D. Ky. Sept. 10, 2014).

The following are illustrated extradition cases where courts have granted bail:

1. *In re Extradition of Gonzalez*, 52 F. Supp. 2d 725 (W.D. La. 1999) (allowing bail in bank robbery case based on extraditee's substantial likelihood of success at the extradition hearing)

2. *In re Extradition of Santos*, 473 F. Supp. 2d 1030 (C.D. Cal. 2006) (allowing bail due to delay and high degree of uncertainty regarding the merits of the extradition request)

3. *In the Matter of the Extradition of Vladimir Blasko to the Slovak Republic*, No. 1:17-mc-67 DAD-SAB (E.D. Cal. Aug. 1, 2018) (allowing bail due to lack of diplomatic urgency and to allow for preparation and participation in pending asylum proceeding)

4. *Matter of Extradition of Demjanjun*k, 612 F.Supp. 544 (N.D. Ohio 1985) (certifying extradition and revoking previously granted bail in unpublished opinion)

5. *In re Extradition of Molnar*, 182 F. Supp. 2d 684 (N.D. Ill. 2002) (granting bail in provisional extradition request proceeding on collective consideration of financial assistance provided to family, seriously ill mother, provisional nature of arrest, lack of fugitive record, previous dismissal of criminal case as indication of weakness on merits, willingness of friends to post home as security for bond)

6. *In re Extradition of Chapman*, 459 F. Supp 2d 1024, 1027 (D. Haw.) (substantial family ties including households, children, and financial interests mitigated flight

risk; and high probability of delay in extradition proceedings justified bail for two extraditees)

7. *In the Matter of Requested Extradition of Kirby*, 106 F.3d 855 (9th Cir. 1996) (affirming district court's allowance of bail due to likely delay of proceedings and appeals therefrom, even where there were potential flights risks because they could be mitigated by electronic monitoring")

8. *In re Extradition of Bowey*, 147 F.Supp. 2d 1365 (N.D. Ga. 2001) (allowing bail so extraditee could participate in divorce proceedings together with likelihood of success in the criminal matter in foreign county)

9. *United States. v. Castaneda-Castillo*, 739 F. Supp. 2d 49 (D. Mass. 2010) (bail predicated on lack of diplomatic necessity for detention, availability for bail in foreign country, and future delays based on complexities of extradition proceedings, including appeals and habeas petitions)

10. *United States. v. Ramnath*, 533 F.Supp. 2d 662 (E.D. Tex. 2008) (bail allowed based on potentially light sentence abroad, likelihood of success on merits)

11. *Kin-Hong v. United States.*, 926 F. Supp. 1180 (D. Mass. 1996) (allowing bail given the probability of substantial delay in the resolution of extradition proceedings despite extraditee fleeing foreign jurisdiction)

12. *U.S. v. Williams,* 480 F.Supp. 482 (D. Md. 1979) (allowing for bail in provisional extradition given disparity in treatment of other extraditees)

13. *Matter of Extradition of Sidali*, 899 F. Supp. 1342 (D.N.J. 1995) (allowing bail after certification of extradition given likely appeals in light of family commitment and devotion, factors that mitigate risk of flight)

14. *In re Extradition of Pliego*, No. 03-3300-M VAM (D. Ariz. March 30, 2004) (denying Government's motion for vacation of order of release and granting bail because extradition proceedings are often delayed, with possible appeals)

15. *Parretti v. United States*, 122 F.3d 758 (9th Cir. 1997) (even where no special circumstances exist, the government's interest in fulfilling a treaty obligation was outweighed by an extraditee's liberty interest as violative of due process) *withdrawn on other grounds*, 143 F.3d 508 (9th Cir. 1998) (en banc).

Ultimately, the determination of special circumstances together with the decision to grant bail is within the sound discretion of the trial judge. *Beaulieu*, 554 F.2d at 1. In its Extradition Memorandum, the United States requests that the Court give advance notice to the parties within a reasonable amount of time in the event the Court contemplates Atkins's release, presumably so that a request for stay could be obtained pending an emergency appeal. However, the district court cannot review of a magistrate judge's bail decision under the Extradition Act and an appellate court can only consider such an order in mandamus proceedings, where the standard of review is a clear usurpation of power or abuse of discretion. *In re Extradition of Ghandtchi*, 697 F.2d 1037, 1038 (11th Cir. 1983) ("We reject the United States' argument that a mandamus should issue to the magistrate. Mandamus is appropriate only in extraordinary cases to remedy a clear usurpation of power or abuse of discretion.") *vacating as moot* 705 F.2d 1315 (1983).

A. *Atkins's release does not pose a danger to others or to the community.*

Atkins's release does not pose a danger to others or to the community. Nor has the United States argued as much in its Extradition Memorandum. The Government instead bases its detention request exclusively on flight risk. Atkins has no criminal record, much less a violent one, and Singapore's extradition request is predicated entirely on claims of white-collar financial

crimes.  Indeed, the only threatening conduct in the record was directed *against* Aureus Capital ("Aureus") employees by purported investors in Singapore and Indonesia.

> B. <u>That Atkins has lived openly and lawfully in the United States since his return in 2014 with his family since is proof that he does not pose a flight risk and there are sufficient safeguards that can be employed to ensure his appearance.</u>

The United States asserts that Atkins poses a significant flight risk because he left Singapore in 2014 after his passport was impounded and returned to the United States by way of Indonesia.  U.S. Extradition Memorandum, Document 5, PAGEID # 1452. Atkins's wife and two young children were residing in Indonesia at the time and they reported threatening and harassing conduct by purported Aureus investors.  This is corroborated by Aureus's Managing Director, April Samson, who detailed in her email of July 18, 2014 to Singapore Commercial Affairs Division ("CAD") Officer Sherlene Tan that "I was very afraid and confused because i [sic] was getting lots of threats in Singapore and in my country [Indonesia]. Document 1-6, PAGEID #1249.  Atkins's returned to the United States was not motivated by fear of prosecution but instead out of concern for the safety and wellbeing of his family.

To be sure, Atkins has lived openly and lawfully in the United States ever since his return in 2014 and has made no efforts whatsoever to conceal his identity or whereabouts.  For instance, Atkins has applied for and received his driver's license after his return and has registered vehicles in his name.  He has filed his federal, state, and local tax returns and he's even registered to vote. A copy of the front pages of Atkins's redacted  2020 and 2021 Federal Income Tax Returns and Ohio Voter Profile are attached hereon  as Exhibit "A" and "B" respectively.   Like most professionals, he maintains a public LinkedIn profile that documents his educational credentials and work history, a copy of which is attached hereon as Exhibit "C." Atkins even has a public Facebook page that promotes his work as an author of several self-published books, which are

likewise publicly available on Amazon under his name and with his likeness.  Copies of Atkins's Facebook and Amazon pages are attached hereon as Exhibits "D" and "E," respectively.  Atkins even sponsored his wife's green card application with U.S. Citizenship and Immigration Services upon their return in 2014.   If Atkins was determined to conceal his whereabouts or identity from Singapore because of expectant criminal charges, which to date have not yet even been filed, it is difficult to imagine a worse effort to do so.

Atkins has been married to Pajriah Atkins since 2005 and they have two young children together: Santiago Atkins, 12, and Emmanuel Atkins, 10.  Santiago attends Kerrer Middle School and Emmanuel attends Scottish Corners Elementary School – both within the Dublin City School District.  Santiago has excelled at soccer and was the recent recipient of the Columbus Crew's 2022 Crew Youth Training Camp MVP award.  And The Ohio Premier Soccer Club recently extended him an offer in their 2022-2023 competitive season program. Emmanuel is a member of Dublin's Community Swim Team.  The family has leased an apartment for several years at 6190 Lakeshire Drive, Dublin, Ohio.  See Lease Agreement Cover Sheet attached hereon as Exhibit "F."  Atkins is a U.S. Citizen and he has no ties to any other country,  much less a means of getting there given the pendency of these proceedings.  His kids and family are unquestionably rooted in this community.

Since November, 2021, Atkins has been gainfully employed with Sony Corporation of America, where he is a Principal Insider Threat Security Officer.  A copy of Atkins's Redacted W-2 from Sony is attached hereon as Exhibit "G."   Before that, he was a Cyber Investigation Expert for Huntington National Bank.  A copy of Atkins's Redacted W-2 from Sony is attached hereon as Exhibit "H."  Atkins also worked for a time with OhioHealth as a Senior Cybersecurity Architect. See LinkedIn profile attached hereon as Exhibit "C."

But even if the Court were still concerned, adequate safeguards exist that can guarantee Atkins's appearance during the pendency of these proceedings. Electronic monitoring together with 24-hour home confinement would allow Atkins to continue his employment, albeit virtually, and he would be able to attend to his familial duties. All these considered, Atkins submits that he is not a flight risk, that he has lived openly and lawfully in the United States since his return in 2014, and that adequate safeguards exist to guarantee his appearance.

C. *Special circumstances warrant Atkins's release during the pendency of these proceedings.*

Having established neither a danger to others nor the risk of flight, Atkins submits that special circumstances warrant his release during the pendency of these extradition proceedings.

**1. Likelihood of substantial delay warrants Atkins' release.**

Numerous courts found the inherent delay in complex extradition cases to be special considerations warranting bail during the pendency of the proceedings. In *Kin-Hong v. United States*, 926 F. Supp. 1180 (D. Mass. 1996), the District Court allowed bail for those very reasons and held that while the Bail Reform Act did not apply, the target of extradition had demonstrated that he was a "tolerable bail risk.". *Id* at 1190, citing *United States v. Williams*, 611 F.2d 914, 915 (1st Cir. 1979). The Government had argued in *Kin-Hong* that the target posed a very high risk of flight because he had left Hong Kong suddenly and relocated his family to the Philippines to avoid extradition. But the district court disagreed insofar as it found that he did not likely know of his imminent arrest, the alleged crime was not one of violence, that the target had no criminal record, and had the support of his family and friends. Ultimately, the district court found that the target's release could be safeguarded by 24-hour home confinement, security officer custody, electronic monitoring, twice-daily check-ins with pretrial services, and the surrender of his passports.

*In the Matter of Requested Extradition of Kirby*, 106 F.3d 855 (9th Cir. 1996), the district court's bail decision was affirmed that was predicated exclusively on an "unusual delay in the appeals process." *Id*. at 863, *citing Salerno v. United States*, 898 F.2d 317 (9th Cir. 1989). The district court used a multitude of factors, including future delays, in allowing for the target's bail in *United State v. Castaneda-Castillo*, 739 F. Supp. 2d 49 (D. Mass. 2010). "Some courts have considered the complicated nature of cases, including the likelihood of habeas corpus proceedings and appeals during which the defendant would be incarcerated, to constitute a special circumstance." *Id.* at 59, *citing United States v. Taitz*, 130 F.R.D. 442 (S.D. Cal. 1990).

In *Matter of Extradition of Sidali*, 899 F. Supp. 1342 (D.N.J. 1995), the district court certified the target's extradition but allowed for bond pending further appellate litigation. "It is apparent to the Court that the issuance of a certificate of extractability will not end this case as Mr. Sidali will pursue his vindication by filing a petition for a writ of habeas corpus and by applying to the Secretary of State for permission to stay in this country." *Id.* at 1351. The release conditions included a $500,000 appearance bond, the use of family members third-party custodians pursuant to 18 U.S.C. § 314(c)(B)(i), home detention, daily reporting to pretrial services, and restricted travel. The district court came to a similar conclusion in affirming the Magistrate Judge's decision to allow the target's release on $20,000. *In re Extradition of Pliego*, No. 03-3300-M VAM (D. Ariz. March 30, 2004). Finding that the target was not a flight risk nor that he fled Mexico to avoid arrest or prosecution, as the Government had contended, the court concluded that "extradition proceedings are often delayed, with possible appeals to the District Court or the Court of Appeals."

Atkins's case involves detailed and complex issues of alleged financial crimes. The Government's initial filing alone was 1,427 pages – an exorbitant amount of discovery that will

need to be carefully analyzed and digested. Moreover, the allegations concern conduct that occurred over eight years ago and in a foreign country. This, too, will delay Atkins's ability to respond to the Government's filings and prepare his defense. And any adverse outcome for either party from these proceedings will likely be petitioned for review both in the District Court and Court of Appeals – a process that likely can take years. And that's not including any final petitions to the Secretary of State. All these considered, Atkins submits that the likely delay given the complicated allegations that have been lodged against him constitute a special circumstance warranting his release.

### 2. Singapore's lack of diplomatic urgency and delay warrant Atkins's release.

"Courts have held that a special circumstance exists where the requesting nation has 'not made prosecution of [the] offense a priority.'" *In the Matter of the Extradition of Vladimir Blasko to the Slovak Republic*, No. 1:17-mc-67 DAD-SAB (E.D. Cal. August 1, 2018) *citing Chapman,* 459 F. Supp. 2d at 1027 (finding a special circumstance where "Mexico waited three years before bringing extradition proceedings against the Respondents, during which Respondents were living openly and notoriously"); *see also Castaneda-Castillo,* 739 F. Supp. 2d at 57-58 (finding lack of explanation for five-year delay between issuance of an order commencing the investigation and the defendant's provisional arrest, where defendant was "easily found," weighed "very heavily in favor of release"); *Wroclawski v. United States,* 634 F. Supp. 2d 1003, 1008 (D. Ariz. 2009) (finding lack of explanation for eleven-year delay in seeking extradition, "despite the fact that Petitioner lived openly in the United States and made no effort to hide his whereabouts," was a special circumstance favoring release).

Atkins has not yet had occasion to fully analyze the voluminous evidentiary exhibits appended to the Government's Extradition Complaint. But even a cursory review establishes

that the offenses that are the subject of Singapore's request are alleged to have occurred between October 2, 2013 and July 17, 2014. Affidavit of Hon Yi, Document 1-2, PAGEID # 39. To date, Atkins still has yet to be charged in Singapore with business fraud under the Companies Act. *Id.* Instead, he is being sought under an arrest warrant issued nearly three years after his alleged criminal conduct on June 21, 2017. *Id.* at PAGEID # 40. It appears that the case against Atkins is predicated largely on the statements he voluntarily provided in six separate interviews with CAD Officer Sherlene Tan. Document 1-5, PAGEID #869-1236. Yet all of those statements were obtained in July of 2014.[2] To be sure, the last substantive investigatory activity in this file seems to have occurred on March 23, 2015, when Aureus local director Myra Grullo responded to an email from CAD Officer Tan. Document 1-6, PAGEID # 1251-52. At this point, Singapore was in possession of all the information that it relies upon in these proceedings and yet it failed to take any action for nearly two additional years before issuing it arrest warrant on July 21, 2017. Document 1-5, Page ID 867.

Officer Tan reports that the Commercial Affairs Division received information on Atkins's whereabouts in the United States in November of 2017. Document 1-5, PAGEID # 867. Yet it failed to submit its diplomatic request to the United States Embassy in Singapore until June 8, 2020 – nearly three years later and six years after the alleged criminal conduct. Document 1-2, PAGEID # 24. For reason that remain unclear, the United States appears to have taken no action on that request until Singapore supplemented its evidence on April 7, 2022. Document 1-6, PAGEID # 1417. And this, too, underscores the United States' own lack of reciprocal diplomatic urgency.

---

[2] Atkins is still evaluating the accuracy of these statement transcripts, which appear to be condensed summaries of the lengthy session recordings.

In sum, Singapore waited over three years to file its arrest warrant under the Companies Act, then waited an additional three years before requesting Atkins's extradition despite having received information on his whereabouts, and then waited two more two years to supply the United States with sufficient information to proceed on its request. While Atkins's departure from Singapore no doubt prolonged this matter, Singapore's own dilatory efforts throughout this investigation establish that it has acted with little or no urgency. And as has been illustrated above, Atkins has been living openly and lawfully in the United States since his return in 2014, making his whereabouts an easy matter to discern for anyone who might have been interested. For the reasons expressed in *Blasko, Castaneda-Castillo*, and *Wroclawski*, Atkins should be released during the pendency of these proceedings.

**3.  Atkins should be released so that he can continue to support his family.**

As mentioned above, Atkins is gainfully employed with Sony and is the exclusive source of income for his family. His wife is a homemaker and cares for their two young children. Atkins is not just the family's economic support; he is also their vital source of transportation to the extent his wife does not have a driver's license. What's more, Atkins's wife recently had an abnormal mammography that uncovered an area of concern in her right breast. A subsequent ultrasound found a mass corresponding to the area of palpable concern and a biopsy was ordered to further investigate the suspicious abnormality.[3] Incidentally, Atkins was accompanying his wife to the breast tumor biopsy when he was apprehended on September 27, 2022. All this is to say that Atkins is needed at home for a multitude of familial reasons and there are sufficient safeguards that can guarantee his appearance while allowing him to work virtually and help with his family.

---

[3] Medical records can be supplied to the Court under seal regarding Mrs. Atkins' medical treatment.

Courts have considered such factors before. *In re Extradition of Molnar*, 182 F. Supp. 2d 684 (N.D. Ill. 2002), the district court granted bail in provisional extradition request proceeding on collective consideration of financial assistance provided to family, a seriously ill mother, the provisional nature of arrest, the lack of fugitive record, a previous dismissal of criminal case as indication of weakness on merits, and the willingness of friends to post home as security for bond. The district court reached a similar holding in *In re Extradition of Chapman*, 459 F. Supp 2d 1024, 1027, where substantial family ties including households, children, and financial interests mitigated flight risk.

**4. Atkins should be released because he is likely to succeed at his extradition hearing.**

Courts routinely consider a target's substantial likelihood of success at the probable cause hearing, or in some cases in the foreign jurisdiction on the merits, as a special circumstances. Atkins has not yet had occasion to fully review the voluminous exhibits appended to the Government's Extradition Complaint but he submits that even a cursory review establishes that much of the claims are based on conclusory, inconsistent, or unsupported allegations.

For instance, the Government makes much of the allegation that Mary Atkins received a bank transfer from Aureus for $12,347.20. United States' Extradition Memorandum, Document 5, PAGEID # 1437. But even Singapore admits that the information regarding Mary Atkins and others was "insufficient to determine the recipients' relationship with Aureus Capital" regarding such alleged third-parties. It is thus of no evidentiary value.

Singapore and the United States also go to great lengths to establish that Aureus's website claimed that nearly all of the investor funds would be deposited in the brokerage account. But Atkins was clear in his interviews with CAD Officer Tan on July 17, 2014 that Aureus's managing director, April Sampson, had created and was responsible for the company's website.

Document 1-5, PAGEID # 890.  Atkins only created some content on missions and values and supplied some information on frequently asked questions.  There is no evidence establishing Atkins's involvement with any other content or representations relied upon in these proceedings.

As for weekly accounting statements sent to clients, Atkins explained that he could not comment on their truth or accuracy because the information was generated by April Sampson.  Document 1-5, PAGEID # 1092.  In fact, much of Aureus's business was conducted by Ms. Samson.  Yet her only comment in this investigation appears to be her email to CAD Office Tan dated July 17, 2014, where she herself acknowledged that she was Aureus's managing director.  Document 1-6, PAGEID #1249.  Even the affidavits provided by Giriprasad Javali Mallikarjuna and Maricar Macaspac Regala @ Macaspac Maricar Ramirez, two purported representative aggrieved investors, establish that neither of them had any dealings with Atkins and met exclusively with April Samson.  Document 1-7, PAGEID # 1281-83; Document 1-8, PAGEID # 1342-44.  Curiously, no information has been provided about whether Singapore is pursuing Samson for alleged criminal conduct despite her management of Aureus.

The gravamen of Singapore's claim appears to be that Aureus purportedly received S$19,646,590.62 in deposits between April 1, 2013 and June 30, 2014 and with outflows to the OANDA forex brokerage appearing to total S$1,649,793.08. United States' Extradition Memorandum, Document 5, PAGEID # 1436; Affidavit of Sherlene Tan, Document 1-5, PAGEID # 862.  As a threshold matter, none of the banking records purportedly relied upon for these figures are included in the nearly 1,497 pages of evidence appended to the Government's Extradition Complaint.  It can be neither independently reviewed nor verified.  Nor does there appear to have been a forensic and detailed audit attempting to reconcile investment funds with company transactions.  Instead, Singapore simply looked at totally deposits and total

withdrawals. But this bare and conclusory review alone cannot sustain a prima facie case of business fraud. And there appears to be little or no evidence establishing that Atkins' involvement with any purported representations regarding how the funds would be invested.

As a final matter, there seem to be serious questions about the applicability of the criminal statute to Atkins. Singapore is proceeding under Section 340(5) of the Companies Act, which provides:

> (5) Where any business of a company is carried on with the intent or for the purpose mentioned in subsection (1), every person who was knowingly a party to the carrying on of the business with the intent or purpose shall be guilty of an offence and shall be liable on conviction to a fine not exceeding $15,000 or to imprisonment for a term not exceeding 7 years or to both.

Subsection (5) is by its own terms confined to companies carried on with the intent or for the purpose mentioned in Subsection (1). Subsection (1) of Section 340 provides:

> (1) If, in the course of the winding up of a company or in any proceedings against the company, it appears that a business of he company has been carried on with the intent to defraud creditors of the company or creditors of any other person for a fraudulent purpose, the Court, on the application of the liquidator or any creditor or contributor of the company, may, if it thinks it proper to do so, declare that any person who was knowingly a party to the carrying on of a business in that manner shall be personally responsible, without any limitations of liability, for all or any of the debts or liabilities of the company as the Court directs.

Subsection (5)'s criminal prohibition of being a party to a fraudulent business thus appears to be limited to wind-up or creditor proceedings against a company. And this makes sense: the clear intention of the Singaporean statute at issue is to curtail asset concealment fraud when creditor or windup proceedings have been commenced. No such proceedings have been alleged here, however, and Subsection (5) is thus inapposite.

Even assuming that Section 340(5) could apply outside of the creditor or wind-up process despite language to the contrary, Singapore's own view of the statute does not allow for criminal liability under the facts in the record.  Singapore's extradition request was supported by the affidavit of Hon Yi, who represents that he is a Deputy Public Prosecutor in the Crime Division of the Attorney-General's Chambers.  Document 1-2, PAGEID #38.  Yi's affidavit details the case history together with the elements necessary for a *prima facie* case against Atkins for a violation of Section 340(5).  *Id.* at PAGEID # 41-42.  According to Yi, the evidence must establish that: (1) Aurues was carrying on a business that falsely represented to clients that it would trade leveraged foreign exchange on their behalf, in return for a share of the profits; (2) the business had a fraudulent purpose insofar as clients were deceived into handing funds to Aureus under the assumption that it would be used for leveraged foreign exchange trading; (3) most of the funds were not used for leveraged foreign exchange trading; and (4) Atkins managed Aureus with knowledge of its fraudulent purpose.  *Id.*  Putting aside the substantive issues with the first three elements, there is absolutely no evidence in the record that Atkins was a manager at Aureus and this alone established that the fourth element cannot be met.  In Atkins's interviews with CAD Officer Tan, he explained that he only dealt with the clients in the United States and Indonesia, which totaled about 15 or 20 of the nearly 1,500 total investors.  Document 1-5, PAGEID #892.  The rest were "managed by April."  This is corroborated by April herself when she explained to CAD Officer Tan on July 18, 2014 that she was the company's managing director and was paid considerably for her responsibilities. Document 1-6, PAGEID #1249.

The following cases all stand for the well-settled rule that the likelihood of success at an extradition hearing can be considered as a special circumstance: *In re Extradition of Gonzalez*, 52 F. Supp. 2d 725 (W.D. La. 1999), (allowing bail in bank robbery case based on extraditee's

substantial likelihood of success at the extradition hearing), *In re Extradition of Santos*, 473 F. Supp. 2d 1030 (C.D. Cal. 2006) (allowing bail due to delay and high degree of uncertainty regarding the merits of the extradition request); *In re Extradition of Bowey*, 147 F.Supp. 2d 1365 (N.D. Ga. 2001) (allowing bail so extraditee could participate in divorce proceedings together with likelihood of success in the criminal matter in foreign county); and *U.S. v. Ramnath*, 533 F.Supp. 2d 662 (E.D. Tex. 2008) (bail allowed based on potentially light sentence abroad, likelihood of success on merits).

### III.　CONCLUSION

Federal prosecutors are directed, in foreign extradition cases, to "vigorously oppose bail for fugitives on the ground that their release jeopardizes the ability of the United States to meet its obligation under international law." United States Attorney Manual, Criminal Resource Manual 618, *Bail Hearing*. But the Government's interest in avoiding diplomatic embarrassment is on a par with, and bound up in its interest in enforcing domestic criminal law. That interest, consequently, justifies detaining individuals who are flight risks, but does not justify detaining those who are not, especially when: (1) there is a substantial likelihood of delay during litigation of the extradition case; (2) Singapore has been dilatory in pursuing this matter and has not acted with much, if any, diplomatic urgency; (3) Atkins has significant responsibilities to his family, who are rooted here; and (4) Atkins is likely to prevail at the probable cause hearing.

WHEREFORE, Michael Atkins respectfully requests that the Court grant his release on conditions it deems appropriate to ensure his appearance during these proceedings.

Respectfully submitted,

 */s/  Mark G. Kafantaris*
Mark G. Kafantaris (#80392)
KAFANTARIS LAW OFFICES
625 City Park Avenue,
Columbus, Ohio 43206
Tel:  (614) 223-1444
Fax:  (614) 300-5123
E-Mail: mark@kafantaris.com

Adam G. Burke (#83184) * Trial Counsel
BURKE, MEIS & ASSOCIATES
625 City Park Avenue, Ste 200A
Columbus, Ohio 43206
Tel:  (614) 280-9122
Fax:  (614) 556-4988
E-Mail: burke142@gmail.com

*Attorneys for Michael P. Atkins*

**CERTIFICATE OF SERVICE**

This is to certify that the foregoing was electronically filed on this 19th day of October, 2022.  Notice of this filing will be sent to Assistant United States of America Heather Hill by operation of the Court's  CM/ECF system.  Parties may access this filing through the Court's system.

 */s/  Mark G. Kafantaris*
Mark G. Kafantaris (#80392)