**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF OHIO**

| | | |
|---|---|---|
| IN THE MATTER OF | ) | |
| THE EXTRADITION OF | ) | Case No. 2:22-mj-630 |
| MICHAEL PHILIP ATKINS | ) | |
| | ) | Magistrate Judge Jolson |
| | ) | |

**MEMORANDUM OF EXTRADITION LAW AND**
**REQUEST FOR CERTIFICATION OF EXTRADITION**

A District Judge of the State Courts of the Republic of Singapore has issued a Warrant of

Arrest for Michael Philip Atkins ("Atkins" or the "fugitive"), alleging that Atkins violated

Section 340(5), with reference to Section 340(1), of the Companies Act.  Singapore seeks Atkins

extradition so that he may be prosecuted on this charge.  The United States, acting at the request

of Singapore, began extradition proceedings against Atkins, and the Court has set an extradition

hearing for December 13, 2022.  As set forth herein, the requirements for extradition certification

have been satisfied, and this Court should therefore certify the extradition request to the

Secretary of State.

## I.    BACKGROUND

In September of 2022, the United States requested, and this Court issued, an extradition

complaint and arrest warrant for the fugitive, Michael P. Atkins.  (Doc. # 1, Complaint; Doc. # 2,

Warrant.)  The government's complaint was sworn in response to a request from Singapore

under the authority of the Treaty on Extradition Between the United States of America and Great

Britain, U.S.-U.K., Dec. 22, 1931, 47 Stat. 2122, continued in force by Continued Application to

Singapore of the United States-United Kingdom Treaty of December 22, 1931, U.S.-Sing., Apr.

23, 1969, 20 U.S.T. 2764 (the "Treaty").  Atkins was subsequently arrested on the warrant and

was transported to his initial court appearance, at which time the Court ordered him detained

pending a detention hearing.  (Doc. #6, Minute Entry).  That detention hearing was held on

October 20, 2022, and Atkins was thereafter ordered detained pending the resolution of this

matter. (Doc. # 17, Minute Entry; Doc. # 22, Order).  The Court's detention Order also set forth

the schedule of further proceedings in this matter, requiring the government to file any briefing

on the issue of extradition by December 1, 2022, and scheduling an extradition hearing for

December 13, 2022.  (Doc. # 22, Order).

The United States seeks Atkins' extradition in accordance with its treaty obligations to

Singapore.  Federal law requires the judicial officer handling the extradition to hold a hearing to

consider the evidence of criminality that Singapore has presented and to determine whether it is

"sufficient to sustain the charge under the provisions of the proper treaty or convention."  18

U.S.C. § 3184.  If the judicial officer finds the fugitive extraditable, she or he must certify that

conclusion to the Secretary of State, who decides whether to surrender the fugitive.  Because the

law regarding extradition is *sui generis*, differing substantially from ordinary criminal or civil

proceedings, the United States submits this memorandum as a summary of the nature of the

extradition hearing and the Treaty's application to the facts of this case.  As detailed here, the

evidence submitted by Singapore fulfills the relevant Treaty requirements.  The Court should

therefore "certify the same" to the Secretary of State, who will then decide whether to surrender

Atkins "according to the treaty."  *Id.*[1]

## II.      STATEMENT OF FACTS

Authorities in Singapore seek Atkins' extradition for an offense related to his role in

---

[1] After the Court completes its "limited inquiry, the Secretary of State conducts an independent review of the case to determine whether to issue a warrant of surrender."  *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 829 (11th Cir. 1993).  "The Secretary exercises broad discretion and may properly consider myriad factors affecting both the individual defendant as well as foreign relations, which an extradition magistrate may not."  *Id.*

operating the company Aureus Capital ("Aureus") from approximately October 2013 to July of 2014. According to the materials that Singapore has submitted to the United States in support of its request for extradition, the fraudulent actions of Aureus and Atkins constitute violations of Section 340(5), in conjunction with Section 340(1), of the Companies Act of Singapore. The materials submitted by Singapore also establish the following facts surrounding Atkins' involvement in Aureus' fraudulent actions.

As set forth in the affidavit of Officer Sherlene Tan (Doc. # 1-5, Exhibit at 46) and the evidence attached thereto, Atkins was the "directing mind" for Aureus and was responsible for all trading activities of the company. According to one of the other company directors, April Samson ("Samson"), Atkins initially engaged in trading activity for her and thereafter approached her about creating Aureus. (Doc. # 1-6, Exhibit at 160.) The purpose of Aureus, as stated on its website and by Atkins, was to engage in leveraged foreign exchange ("Forex") trading on behalf of its clients. (Doc. # 1-5, Exhibit at 60; Doc. # 1-7, Exhibit at 1 to 2.) Bank records obtained by Officer Tan show that during the time Aureus operated in Singapore, nearly $20 million[2] was deposited in its DBS Bank, Ltd. Account ("DBS account"), approximately 93% of which were deposits from Aureus' client investors. Of that amount, less than $2 million was invested in the OANDA Corporation for purposes of trading. (Doc. # 1-5, Exhibit at 47-48.) The failure to invest the deposited monies as promised essentially constituted a "Ponzi" scheme, which was led by Atkins.

To carry out the fraudulent scheme, Atkins, through Aureus, offered the public leveraged foreign exchange trading services in return for Aureus receiving a share of the profits made from the trades it conducted on its clients' behalf. (Doc. # 1-5, Exhibit at 47.) Aureus' website

---

[2] All monetary amounts are listed in Singaporean dollars unless otherwise indicated.

represented that any funds clients deposited to Aureus' DBS account for investment purposes would, in fact, be invested in Forex trading, after deducting a bank transfer fee of $40. (Doc. # 1-7, Exhibit at 1 to 15.) Individuals who were interested in investing through Aureus filled out an application form and signed various agreements that were provided by Aureus. (*Id*. at 9, 27 to 55.) Pursuant to those client agreements, Aureus would be entitled to 40% to 50% of the profits made on the clients' investment monies, while the losses would be fully borne by the clients. (*Id*.) The agreements also required clients to transfer their funds to Aureus' DBS bank account, and Aureus provided instructions on how to make such transfers. (*Id*.) Once Aureus accepted a client's application and the client deposited funds into Aureus' DBS bank account, they would generally receive emails from Aureus, sent by Samson, indicating that their funds were received and would be transferred to OANDA. (*See, e.g.* Doc. # 1-7, Exhibit at 56 to 61.) Clients also received weekly statements via email showing the profits or losses for their accounts. (Doc. # 1-5, Exhibit at 51; Doc. # 1-7, Exhibit at 71.) These statements were created by Atkins, the only company director who had access to the OANDA trading account. (*Id*. at 52, 62, 64, 75.)

Within the company, Samson and the other director, Myra Grullo ("Grullo"), were responsible for client support and communications. (*Id*. at 59.) Samson also paid Aureus' office expenses through the company's DBS account. (*Id*. at 64; Doc. # 1-6, Exhibit at 160.) Atkins' role in the company was to handle, and supposedly trade, the money clients invested with Aureus, and he purported to be experienced in Forex trading. (Doc. # 1-5, Exhibit at 59; Doc. # 1-7, Exhibit at 9; Doc. # 1-8, Exhibit at 2.)

In July of 2014, Singapore Police began receiving complaints from Aureus clients regarding their inability to withdraw their funds from their Aureus accounts. (Doc. # 1-5, Exhibit at 47.) During the ensuing investigation, Officer Tan interviewed Atkins on numerous

occasions, obtained statements from Samson, Grullo, and several Aureus clients, and reviewed banking records for Aureus' DBS account. (*See generally* Doc. #1-5, Exhibit at 46-54.) That investigation revealed that Atkins, who admitted that he was responsible for the trading and investment functions of Aureus, failed to invest the clients' funds as was promised, and instead used the monies Aureus received solely to pay himself, the other company directors, the company's other expenses, clients who requested withdrawals, and other unknown individuals or entities who had no apparent connection to Aureus. (*Id.)*

Specifically, the DBS bank records revealed that Aureus received deposits into the DBS account of $19,646,590.62 between April of 2013 and June of 2014. (*Id*. at 48.) Of that amount, nearly $9 million was paid out pursuant to client requests to withdraw their monies from Aureus. (*Id*.) Approximately $4.5 million was paid out to non-client third parties, including on one instance, Atkins mother. (*Id*. at 48 to 50.) Only $1,649,793.08 of the funds that clients had invested for the purpose of Forex trading was actually transferred to Aureus' OANDA account for trading purposes. (*Id*. at 48.) As indicated above, Atkins admitted to Officer Tan that he was the only person who had access to Aureus' OANDA account and was solely responsible for the trading and investment decisions. (*Id*. at 47, 64-65.)

The failure of Atkins and Aureus to properly invest client funds led to numerous Aureus clients losing their investment monies. (Doc. # 1-5, Exhibit at 65; Doc. # 1-6, Exhibit at 161; Doc. # 1-7, Exhibit at 29; Doc. # 1-8, Exhibit at 3.) As a result of Atkins' fraudulent activities, the government of Singapore seeks to prosecute him for the violation described above. Singapore has submitted a formal request for extradition supported by documentary evidence that federal law and the Treaty require for the United States to grant the extradition request.

## III. LEGAL FRAMEWORK APPLICABLE TO EXTRADITION

### A. General Principles of International Extradition

Extradition is primarily an executive function with a specially defined role for a judicial officer, who is authorized by statute to determine whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. §§ 3184, 3186; *Martin v. Warden, Atlanta Penitentiary*, 993 F.2d 824, 828 (11th Cir. 1993); *Lo Duca v. United States*, 93 F.3d 1100, 1110 n.10 (2d Cir. 1996); *Juarez-Saldana v. United States*, 700 F. Supp. 2d 953, 955 (W.D. Tenn. Mar. 25, 2010) (citing *United States v. Kin-Hong*, 110 F.3d 103, 109 (1st Cir. 1997)). The Secretary of State, and not the Court, makes the ultimate decision regarding whether the fugitive should be surrendered to the requesting country. *See* 18 U.S.C. §§ 3184, 3186; *Martinez v. United* States, 282 F.3d 451, 455 (6th Cir. 2016) (*en banc*); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 584 (6th Cir. 1985), *vacated on other grounds*, 10 F.3d 338 (6th Cir. 1993); *In re Extradition of Bilanovic*, No. 1:08-mj-74, 2008 WL 5111846, at *5 (W.D. Mich. Dec 3, 2008) ("Extradition is an executive rather than a judicial function."). "This bifurcated procedure reflects the fact that extradition proceedings contain legal issues peculiarly suited for judicial resolution, such as questions of the standard of proof, competence of evidence, and treaty construction, yet simultaneously implicate questions of foreign policy, which are better answered by the executive branch." *Kin-Hong*, 110 F.3d at 110.

At the extradition hearing, the Court's role is limited to considering the requesting country's evidence and determining whether the legal requirements for certification of extraditability—as defined in the applicable extradition treaty, statutes, and case law—have been established. *Charlton v. Kelly*, 229 U.S. 447, 461 (1913) (analogizing extradition hearing to a preliminary hearing in a criminal case). *See also In re Extradition of Drayer*, 190 F.3d 410, 415

(6th Cir. 1999) ("An extradition proceeding is not a forum in which to establish[] the guilt or

innocence of the accused; rather, the sole inquiry is into probable cause.").  If the Court finds that

the requirements for certification have been met, it must provide the certification to the Secretary

of State, together with a copy of any testimony taken before the Court, and must commit the

fugitive to the custody of the U.S. Marshal to await the Secretary's final determination regarding

surrender.  *See* 18 U.S.C. § 3184 (providing that following certification, the extradition judge

"shall issue his warrant for the commitment of the person so charged to the proper jail, there to

remain until such surrender shall be made").

In fulfilling its function under § 3184, the judicial officer should construe liberally the

applicable extradition treaty in order to effect its purpose, namely, the surrender of fugitives to

the requesting country.  *See Factor v. Laubenheimer*, 290 U.S. 276, 303 (1933) ("Extradition

treaties are to be liberally, not strictly, construed.").  As the Supreme Court explained in *Factor*:

> In choosing between conflicting interpretations of a treaty obligation, a
> narrow and restricted construction is to be avoided as not consonant with
> the principles deemed controlling in the interpretation of international
> agreements. Considerations which should govern the diplomatic relations
> between nations, and the good faith of treaties, as well, require that their
> obligations should be liberally construed so as to effect the apparent
> intention of the parties to secure equality and reciprocity between them.

*Id.* at 293.  *See also Martinez*, 828 F.3d at 463 ("default rule" is that any ambiguity in extradition

treaty must be construed in favor of "facilitat[ing] extradition"); *Grin v. Shine*, 187 U.S. 181, 184

(1902) (court should "interpret extradition treaties to produce reciprocity between, and expanded

rights on behalf of, the signatories").  To carry out a treaty obligation, the treaty "should be

construed more liberally than a criminal statute or the technical requirements of criminal

procedure."  *Id.* at 298.  This is because the United States cannot expect foreign governments to

be versed in our criminal laws and procedures, *see Grin*, 187 U.S. at 184, thus, "[f]orm is not to

be insisted upon beyond the requirements of safety and justice." *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925).

Additionally, a court should afford great weight to statements by the U.S. Department of State regarding treaty interpretation. *See El Al Israel Airlines*, *Ltd. v. Tseng*, 525 U.S. 155, 168 (1999); *Sumitomo Shoji America, Inc. v. Avagliano*, 457 U.S. 176, 184–85 (1982) ("Although not conclusive, the meaning attributed to treaty provisions by the Government agencies charged with their negotiation and enforcement is entitled to great weight."); *Ahmad v. Wigen*, 726 F. Supp. 389, 402 (E.D.N.Y. 1989), *aff'd*, 910 F.2d 1063 (2d Cir. 1990) ("The State Department's view deserves deference, unless it represents a substantial departure from national or international norms.").

## B. Extradition Hearings Follow Unique Procedures

### 1. An Extradition Hearing Is Not a Criminal Proceeding

The purpose of an extradition hearing is to decide the sufficiency of the materials the foreign government has submitted to the United States in support of its extradition request, not to determine the guilt or innocence of the accused. *See Collins v. Loisel*, 259 U.S. 309, 316 (1922); *Neely v. Henkel*, 180 U.S. 109, 123 (1901). Because of the limited nature of the hearing, special procedures apply. *See Martinez*, 828 F.3d at 455.

Neither the Federal Rules of Criminal Procedure nor the Federal Rules of Evidence apply to extradition proceedings. *See* Fed. R. Crim. P. 1(a)(5)(A) ("Proceedings not governed by these rules include . . . the extradition and rendition of a fugitive."); Fed. R. Evid. 1101(d)(3) ("These rules – except for those on privilege – do not apply to . . . miscellaneous proceedings such as extradition or rendition."); *In re Extradition of Harusha*, No. 07-x-51072, 2008 WL 1701428, at *3 (E.D. Mich. Apr. 9, 2008); *Balzan v. United States*, 702 F.3d 220, 224 (5th Cir. 2012). For

example, "hearsay is permitted and admissible" at an extradition hearing. *Harusha*, 2008 WL

1701428, at *4. *See also Collins*, 259 U.S. at 317; *O'Brien v. Rozman*, 554 F.2d 780, 783 (6th

Cir. 1977).

Furthermore, many Constitutional protections applicable in criminal cases do not apply.

For example, a fugitive has no right to cross-examine witnesses who might testify at the hearing

or to confront his accusers. *See Bingham v. Bradley*, 241 U.S. 511, 517 (1916); *Oen Yin-Choy v.

Robinson*, 858 F.2d 1400, 1406-07 (9th Cir. 1988); *Ordinola v. Hackman*, 478 F.3d 588, 608

(4th Cir. 2007). There is no Sixth Amendment right to a speedy extradition. *See Harusha*, 2008

WL1701428, at *3*; McDonald v. Burrows*, 731 F.2d 294, 297 (5th Cir. 1984); *Sabatier v.

Dabrowski*, 586 F.2d 866, 869 (1st Cir. 1978). The exclusionary rule is inapplicable. *Simmons

v. Braun*, 627 F.2d 635, 636–37 (2d Cir. 1980). And the Fifth Amendment guarantee against

double jeopardy does not apply to successive extradition proceedings. *Collins v. Loisel*, 262

U.S. 426, 429 (1923); *Harusha*, 2008 WL1701428, at *3 (citing *Neely*, 180 U.S. at 122)).

### 2. Extradition Hearings Rely on Written Submissions and Do Not Require Live Witnesses

A certification of extradition may be, and typically is, based on the authenticated

documentary evidence and information that the government seeking extradition has provided.

Certification has been found appropriate when based on "unsworn statements of absent

witnesses." *Collins*, 259 U.S. at 31. Similarly, documentary evidence that identified a fugitive

as a guard at an SS training camp has been found sufficient "to justify holding a person for trial

in another place." *Demjanjuk*, 776 F.2d at 576. Indeed, as the Fourth Circuit noted, "courts have

consistently concluded that hearsay is an acceptable basis for a probable cause determination in

the extradition context. Unsworn statements can be sufficient to support a probable cause

determination." *Haxhiaj v. Hackman*, 528 F.3d 282, 292 (4th Cir. 2008) (internal citations

omitted).  *See also Bovio v. United States*, 989 F.2d 255, 259–61 (7th Cir. 1993) (finding

Swedish investigator's statement sufficient to establish probable cause); *Castro Bobadilla v.*

*Reno*, 826 F. Supp. 1428, 1433-1434 (S.D. Fla. 1993) (finding documents and statements

sufficient for extradition to Honduras), *aff'd*, 28 F.3d 116 (11th Cir. 1994); *Shapiro v.*

*Ferrandina*, 478 F.2d 894, 902-03 (2d Cir. 1973).  The finding may rest upon written statements

from a foreign prosecutor or judge summarizing the evidence.  *Rice v. Ames*, 180 U.S. 371, 375–

76 (1901); *accord Glucksman v. Henkel*, 221 U.S. 508, 513–14 (1911).  Extradition treaties do

not require, or even anticipate, live witness testimony at the hearing. *See Artukovic v. Rison*, 784

F.2d 1354, 1356 (9th Cir. 1986).  Requiring the "demanding government to send its citizens to

another country to institute legal proceedings, would defeat the whole object of the treaty."

*Bingham*, 241 U.S. at 517.

Federal statute and the applicable treaty govern the nature and admissibility of evidence

at an extradition hearing.  The relevant federal statute, 18 U.S.C. § 3190, provides that

documents "shall" be received and admitted into evidence at an extradition hearing "if they shall

be properly and legally authenticated so as to entitle them to be received for similar purposes by

the tribunals of the foreign country from which the accused party shall have escaped, and the

certificate of the principal diplomatic or consular officer of the United States resident in such

foreign country shall be proof that the same, so offered, are authenticated in the manner

required."  Here, the government has provided a declaration of Tom Heinemann, an Attorney

Adviser in the Office of the Legal Adviser for the Department of State (the "Heinemann

Declaration").  (Doc. # 1-1, Exhibit at 1.)  As the Heinemann Declaration states, the documents

Singapore has submitted in support of extradition comply with 18 U.S.C. § 3190 because the

principal consular officer of the United States in Singapore certified them.  (*Id.* ¶ 6; Doc. # 1-2 at 2; Doc # 1-8 at 76.)

### 3.    The Fugitive's Evidence is Limited

Due to the narrow scope of an extradition hearing, which is not a trial, a fugitive's opportunity to challenge the evidence introduced against him is very circumscribed.  A fugitive may not introduce evidence that contradicts the materials the requesting country has submitted; rather, he may only introduce evidence explaining the submitted evidence.  *See Charlton*, 229 U.S. at 461-62; *In re Extradition of Basic*, No. 5:11-MJ-5002, 2012 WL 3067466, *at 2 (E.D. Ky. July 27, 2012).  Courts within this jurisdiction have followed this rule, holding that "only evidence that explains the evidence submitted in support of extradition is admissible."  *In re Extradition of Hasani*, No. 2:14–mj–189, 2014 WL 4549232, *3 (S.D. Ohio Sept. 12, 2014).  A contrary rule "might compel the demanding government to produce all its evidence . . . both direct and rebutting, in order to meet the defense thus gathered from every quarter."  *Harusha*, 2008 WL 1701428, at * 4 (quoting *Collins*, 259 U.S. at 316 (internal citations omitted)).  Whether to admit explanatory evidence is largely within the court's discretion.  *Demjanjuk*, 603 F. Supp. at 1465.

While the courts have not been precise in delineating between explanatory and contradictory evidence, the First Circuit has referred to "additional or corroborative documents," as the sorts of evidence that may be received during an extradition hearing.  *Koskotas v. Roche*, 931 F.2d 169, 175 (1st Cir 1991).  Similarly, the Seventh Circuit has upheld the refusal to admit evidence that tended to "contradict or challenge the credibility of the facts implicating petitioner" rather that explain the government's evidence.  *Eain v. Wilkes*, 641 F.2d 504, 511 (7th Cir. 1981.)  The purpose of allowing the introduction of "explanatory evidence," is to allow the

accused an opportunity to present reasonably clear-cut proof which should be limited in scope

and have some reasonable chance of negating probable cause. *See In re Sindona*, 450 F.Supp.

672, 685 (S.D.N.Y. 1978).

Courts routinely reject technical and affirmative defenses in extradition proceedings. *See*

*Bingham*, 241 U.S. at 517 (rejecting objections that "savor of technicality"); *Harusha*, 2008 WL

1701428, at *5 ("[A]ffirmative defenses, including self-defense, are not relevant in extradition

hearings and should not be considered) (citing *Charlton*, 229 U.S. at 462); *Collins*, 259 U.S. at

316–17. Likewise, a fugitive may not introduce evidence that seeks to impeach the credibility of

the requesting country's witnesses. *See, e.g.*, *Bovio*, 989 F.2d at 259.

### 4. The Executive Branch Considers Matters Other Than Sufficiency; Rule of Non-Inquiry

Other than the sufficiency of the evidence, all matters that a fugitive may raise as

defenses to extradition are to be considered by the Secretary of State, not by the Court. *See* 18

U.S.C. §§ 3184, 3186. For example, the Secretary of State should consider a fugitive's

contention that an extradition request is politically motivated, that the requesting state's justice

system is unfair, or that extradition should be denied on humanitarian grounds. *Harusha*, 2008

WL 1701428, at *5; *Prasoprat*, 421 F.3d at 1016; *Koskotas*, 931 F.2d at 173-74. This is

consistent with the long-held understanding that deciding whether to surrender a fugitive to a

foreign government is "purely a national act . . . performed through the Secretary of State"

within the executive's powers to conduct foreign affairs. *In re Kaine*, 55 U.S. 103, 110 (1852).

## IV. THIS COURT SHOULD CERTIFY THE EXTRADITION REQUEST

A court should certify to the Secretary of State that a fugitive is extraditable when the

following five requirements are met: (1) the judicial officer is authorized to conduct the

extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable

extradition treaty is in full force and effect; (4) the treaty covers the offenses for which

extradition is requested; and (5) sufficient evidence exists to support a finding of probable cause

as to each offense.  18 U.S.C. § 3184; *See Fernandez*, 268 U.S. at 312; *In re Extradition of*

*Robinson*, No. 3:11MJ7047, 2011 WL 6072102, at *1 (N.D. Ohio Oct. 21, 2011).

A.     **This Court Has Authority Over the Proceedings**

The extradition statute authorizes proceedings to be conducted by "any justice or judge of

the United States, or any magistrate judge authorized so to do by a court of the United States, or

any judge of a court of record of general jurisdiction of any State."  18 U.S.C. § 3184.  As such,

the judicial officer conducting the extradition hearing that Section 3184 prescribes does not

exercise "any part of the judicial power of the United States" but, rather, acts in a "non-

institutional capacity by virtue of a special authority." *In re Extradition of Howard*, 996 F.2d

1320, 1325 (1st Cir. 1993) (internal quotation marks and citations omitted). Both magistrate

judges and district judges may render a certification under Section 3184.  *See Austin v. Healey*, 5

F.3d 598, 601-02 (2d Cir. 1993); *Harusha*, 2008 WL 1701428, at *2.

B.     **This Court Has Jurisdiction Over Atkins**

A court has jurisdiction over a fugitive found within its jurisdictional boundaries.  *See* 18

U.S.C. § 3184 ("[A judge] may, upon complaint made under oath, charging any person found

within his jurisdiction . . . issue his warrant for the apprehension of the person so charged."); *see*

*Pettit v. Walshe*, 194 U.S. 205, 219 (1904); *Grin*, 187 U.S. at 185–86.  Because Atkins was

found and arrested in the city of Dublin, Ohio, which is within this District, the personal

jurisdictional requirement of 18 U.S.C. § 3184 is met.

C.      **The Treaty Is in Full Force and Effect**

The extradition statute, 18 U.S.C. § 3184, provides for extradition where a treaty or

convention is in force between the requesting state and the United States.  *See In re Chan Kam-*

*Shu*, 477 F.2d 333 (5th Cir. 1973), *cert. denied*, 414 U.S. 847 (1973); *Hoxha v. Levi*, 465 F.3d

554, 562 (3d Cir. 2006); *United States ex rel Saroop v. Garcia*, 109 F.3d 165, 171 (3d Cir. 1997).

Here, the Heinemann Declaration states that the Treaty is in full force and effect.  The

Department of State's determination is entitled to deference from the Court.  *See Terlinden v.*

*Ames*, 184 U.S. 270, 288 (1902); *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961) ("While courts

interpret treaties for themselves, the meaning given them by the departments of government

particularly charged with their negotiation and enforcement is given great weight"); *Charlton*,

229 U.S. at 468; *Kastnerova v. United States*, 365 F.3d 980, 985–87 (11th Cir. 2004), *cert.*

*denied*, 541 U.S. 1090 (2004).

D.      **The Treaty Covers the Offense for Which Singapore Seeks Extradition**

Extradition treaties create an obligation for the United States to surrender fugitives under

the circumstances the treaty defines.  Here, Article 3 of the relevant Treaty provides that

reciprocal extradition shall be granted between the countries for certain enumerated offenses,

including: 1) "[f]raud by a bailee, banker, agent, factor, trustee, director, member, or public

officer of any company, or fraudulent conversion"; and 2) "[o]btaining money, valuable security,

or goods, by false pretenses; receiving any money, valuable security, or other property, knowing

the same to have been stolen or unlawfully obtained."  (Doc. # 1-1, Exhibit at 8.)   In assessing

whether the crime for which extradition is requested is covered by the Treaty, the Court should

examine the description of criminal conduct provided by Singapore in support of its charge and

14

decide whether that conduct constitutes an offense among those listed in Article 3. *Factor*, 290

U.S. at 299-300.

Singapore seeks to extradite Atkins for violations of Section 340(5), read in conjunction

with Section 340(1), of the Companies Act. Those statutes provide as follows:

> 340(1). If, in the course of winding up of a company or in any proceedings against a company, it appears that any business of the company has been carried on with intent to defraud creditors of the company or creditors of any other person or for any fraudulent purpose, the Court, on the application of the liquidator or any creditor or contributor of the company, may, if it thinks proper to do so, declare that any person who was knowingly a party to the carrying on of the business in that manner shall be personally responsible, without any limitation of liability, for all or any of the debts or other liabilities of the company as the Court directs.

> 340(5). Where any business of a company is carried on with the intent or for the purpose mentioned in subsection (1), every person who was knowingly a party to the carrying on of the business with that intent or purpose shall be guilty of an offence and shall be liable on conviction to a fine not exceeding $15,000 or to imprisonment for a term not exceeding 7 years or to both.

In this case, the relevant sections of the Companies Act correspond with both fraud by a

director or member of a company and/or obtaining money by false pretenses, as described in

Article 3 of the Treaty. Further, the criminal conduct Atkins is alleged to have committed –

obtaining money from client investors for the purpose of Forex trading but then failing to trade

such funds or otherwise return them to clients – constitutes at least two extraditable offenses

listed within Article 3 of the Treaty. Specifically, his conduct can be classified as either "[f]raud

by a bailee, banker, agent, factor, trustee, director, member, or public officer of any company, or

fraudulent conversion"; or "[o]btaining money, valuable security, or goods, by false pretenses;

receiving any money, valuable security, or other property, knowing the same to have been stolen

or unlawfully obtained." Thus, the Treaty covers the offense for which Singapore seeks to

extradite Atkins and this requirement for certification has been met.

**E.      Probable Cause Exists to Believe that Atkins Committed the Offense**

To certify the evidence to the Secretary of State, the Court must conclude that probable

cause exists to believe that the person before it committed the offense for which extradition is

sought.  *See* 18 U.S.C. § 3184; *Demjanjuk*, 776 F.2d at 576.  *See also Harusha*, 2008 WL

1701428, at *6 ("The probable cause standard applicable to an extradition hearing is the same as

the standard used in federal preliminary hearings.").  The extradition judge's probable cause

determination is "not a finding of fact 'in the sense that the court has weighed the evidence and

resolved disputed factual issues,'" but instead "'serve[s] only the narrow function of indicating

those items of submitted evidence on which the decision to certify extradition is based.'" *Quinn*

*v. Robinson*, 783 F.2d 776, 791 (9th Cir. 1986) (quoting *Caplan v. Vokes*, 649 F.2d 1336, 1342

n.10 (9th Cir. 1981)).

The evidence is sufficient, and probable cause exists, if a person of ordinary prudence

and caution can conscientiously entertain a reasonable belief in the probable guilt of the accused.

*Gerstein v. Pugh*, 420 U.S. 103, 111 (1975).  The Supreme Court stated in *Benson v. McMahon*

that:

> [T]he proceeding before the commissioner is not to be regarded as
> in the nature of a final trial by which the prisoner could be
> convicted or acquitted of the crime charged against him, but rather
> of the character of those preliminary examinations which take
> place every day in this country before an examining or committing
> magistrate for the purpose of determining whether a case is made
> out which will justify the holding of the accused, either by
> imprisonment or under bail, to ultimately answer to an indictment,
> or other proceeding, in which he shall be finally tried upon the
> charge made against him.

127 U.S. 457, 463 (1888).  *See also Fernandez*, 268 U.S. at 312 ("Competent evidence to

establish reasonable grounds is not necessarily evidence competent to convict."); *Collins*, 259

U.S. at 316 ("The function of the committing magistrate is to determine whether there is

competent evidence to justify holding the accused to await trial, and not to determine whether the evidence is sufficient to justify a conviction."); *Ordinola*, 478 F.3d at 608 ("It is fundamental that the person whose extradition is sought is not entitled to a full trial at the magistrate's probable cause hearing . . . . That is the task of the . . . courts of the other country.")

Here, the materials Singapore has provided establish probable cause to believe that Atkins committed the offense for which Singapore seeks extradition. Specifically, the affidavit of Officer Tan, including the numerous evidentiary exhibits that are attached thereto, summarizes Singapore's evidence against Atkins. The attachments include numerous transcripts of interviews of Atkins in which he admits many of the aspects of the offense, and further identify the witnesses, bank statements, and other documentary evidence that support the allegations. This evidence is sufficient to establish probable cause that Atkins was a knowing party to the carrying on of a business with the intent or purpose of defrauding its investors, as prohibited by Section 340(1), (5) of the Singapore Companies Act.

The primary evidence attached to Officer Tan's affidavit consists of the transcripts of five interviews of Atkins. In those interviews, Atkins admitted that he was the managing director of Aureus, that he created the company with Samson, and that he was the only person responsible for the investment and trading of client funds. He further admitted that he created the weekly earnings and losses statements that were sent to clients, that the company ended up losing client funds, and that he was attempting to obtain money from other sources in order to repay the company's clients. While Atkins claimed that the loss of funds was the result of trading losses, the bank records that Officer Tan has summarized show that both Atkins' statement and the weekly profit/loss statements he created were false.

17

Atkins claim that the loss of the clients' funds was due to trading losses is belied by the records from Aureus' DBS account that show Atkins failed to invest most of the money that clients deposited in that account. As indicated above, less than $2 million of the nearly $19[3] million that Aureus received from clients was transferred to Aureus' OANDA account for trading. While all of the trading activity conducted by Atkins resulted in net losses, that is not how most of the money was lost. It was paid out to other clients, to Atkins, other Aureus directors, other unknown individuals and companies, and, on at least one instance, to a family member of Atkins.

Officer Tan's affidavit and evidence also show that the way Atkins utilized the funds that clients deposited was not in keeping with what Aureus represented to its clients. On both its website and in the various agreements that clients signed, examples of which are attached to Officer Tan's affidavit, Aureus represented that all money that clients deposited in Aureus' DBS bank account would be utilized for Forex trading. They did not agree, and, according to the statements of two representative clients, did not know that Atkins would use the money to pay business expenses, other clients, and the company directors. Atkins fraudulently took the clients' money, knowing that he was not investing it in the manner that they were promised, and utilized it for purposes to which they did not agree. These actions constitute a violation of Sections 340(1) and 340(5) of Singapore's Companies Act, as described above. The evidence of Atkins actions that Officer Tan has submitted thus established probable cause that Atkins has committed the violations. Accordingly, Singapore's submissions in support of its extradition request establish probable cause and this required aspect for certification has been met.

---

[3] According to Officer Tan's affidavit, of the more than $19 million that were deposited into Aureus' DBS account, $18,275,704 appeared to be funds collected or deposited by clients.

## V. CONCLUSION

For the foregoing reasons, the United States respectfully requests the certification of

Atkins' extraditability to Singapore for the offenses described herein.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

s/ *Heather A. Hill*
HEATHER A. HILL (0100920)
Assistant United States Attorney
303 Marconi Boulevard, Suite 200
Columbus, Ohio 43215
(614) 469-5715
Fax: (614) 469-5653
Heather.Hill@usdoj.gov

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was served electronically this 1st

day of December, 2022, upon Mark Kafantaris and Adam Burke, counsel for the defendant.

s/*Heather A. Hill*
HEATHER A. HILL (0100920)
Assistant United States Attorney