IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

IN THE MATTER OF
THE EXTRADITION OF
MICHAEL PHILIP ATKINS

Case No. 2:22-mj-00630
Magistrate Judge Jolson

**FINDINGS OF FACT, CONCLUSIONS OF LAW,
AND CERTIFICATION OF EXTRADITABILITY**

The question before the Court is whether to certify the Government's request for the extradition of Michael Philip Atkins. Because the Government has met its burden, the Court will certify the extradition to the United States Secretary of State for further consideration.

**I.     BACKGROUND**

As alleged in the Complaint, the country of Singapore seeks to extradite Atkins, a U.S. citizen (Doc. 1-2 at 6), for criminal prosecution of alleged violations of Article 340(5) of the Companies Act (Chapter 50), statutes of the Republic of Singapore ("Companies Act"). (Doc. 1 at 1–2). Atkins allegedly used his role as Director and majority shareholder of Aureus Capital ("Aureus") to carry out a "Ponzi" scheme and defraud investors of approximately $4,000,000. (*Id.* at 2).

Aureus purported to offer clients foreign exchange trading services in return for a share of the profits resulting from the trades. (*Id.* at 3). In July 2014, the Commercial Affairs Division ("CAD") of the Singapore Police Force ("SPF") began receiving reports from Aureus clients about potentially fraudulent activity by Aureus management. (*Id.* at 4). Atkins was interviewed many times by CAD officers and, in one such interview, admitted he was the sole person at Aureus in charge of trading client funds. (*Id.* at 5–6). Ultimately, the CAD investigation concluded that

between April 1, 2013 and June 30, 2014, 93% of cash inflows to Aureus's bank account came from clients, a sum of approximately 19.6 million Singaporean dollars ("S$"). (*Id.* at 5).

Singaporean authorities took action and arrested Atkins in July 2014. (Doc. 1 at 5). He was released on a cash bail, but the Singaporean government kept his passport. (*Id.* at 6). At some point between August 5 and August 18, 2014, Atkins absconded. (*Id.* at 6–7). He traveled to Jakarta, Indonesia, where he applied for a new passport at the U.S. Embassy by falsely claiming he had lost his previous one. (*Id.* at 7). With that fraudulently obtained passport, Atkins returned to the United States. (*Id.*)

On June 21, 2017, Singaporean authorities obtained a Warrant of Arrest for the purposes of extraditing Atkins. (Doc. 1-2 at 12). Roughly three years later, on June 8, 2020, they made a request for Atkins's extradition to the U.S. Embassy in Singapore, pursuant to the United States-Singapore Treaty ("the Treaty"). (*Id.* at 24). On February 11, 2022, Singaporean authorities supplemented their request for Atkins's extradition with the U.S. Embassy. (Doc. 1-8 at 1417–27). Then, on September 21, 2022, the United States Government ("the Government") filed a Complaint in this matter, fulfilling its Treaty obligation to Singapore and initiating the present action. (Doc. 1).

On September 27, 2022, Atkins was arrested. (Doc. 9). The Government then filed its Memorandum of Extradition Law and Request for Detention Pending Extradition Proceedings. (Doc. 5). An Initial Appearance occurred the same day, at which Atkins was made aware of the pending charges against him in Singapore and the request for his extradition. (Doc. 6). The Court ordered he be temporarily detained pending further extradition proceedings. (Doc. 8). The Court appointed Federal Public Defender Deborah L. Williams to represent Atkins in this matter, but he has since retained private counsel. (Docs. 10, 11).

The Court ruled that Atkins was to be detained pending further extradition proceedings. The Court later denied Atkins's Motion for Discovery. (Doc. 26). The Government submitted its Memorandum of Extradition Law and Request for Certification of Extradition (Doc. 24), and Atkins filed his Memorandum in Opposition (Doc. 27) in advance of the extradition hearing. On December 13, 2022, the Court held an extradition hearing, at which Michael Philip Atkins appeared before the Court, in person and by counsel, Adam Gregory Burke and Mark George Kafantaris, as did Assistant United States Attorney for the Southern District of Ohio Heather A. Hill. At the Hearing, both sides presented arguments outside the scope of their prior briefing. Accordingly, the Court held the record open for seven (7) days, so the parties could supplement their written briefing (Docs. 24, 27). Atkins and the Government submitted additional memoranda for the Court's review (Docs. 29, 30). The Court now rules on the certification of extradition for Atkins.

**II.     STANDARD**

"Extradition is primarily an executive function rather than a judicial function." *In re Extradition of Hasani*, No. 2:14-MJ-189, 2014 WL 4549232, at *3 (S.D. Ohio Sept. 12, 2014) (citing *Hoxha v. Levi*, 465 F.3d 554, 560 (3d Cir. 2006)). A magistrate judge must certify extradition of a fugitive-extraditee to the Secretary of State of the United States if the magistrate judge determines that the evidence is sufficient "to sustain the charge under the provisions of the proper treaty or convention ...." 18 U.S.C. § 3184. The Court must determine only whether there is "probable cause" or "reasonable grounds" to believe that Atkins is guilty of the crime charged. *Fernandez v. Phillips*, 268 U.S. 311, 312 (1925). Certification is required where (1) the judicial officer is authorized to conduct the extradition proceeding; (2) the court has jurisdiction over the fugitive; (3) the applicable treaty is in full force and effect; (4) the crimes for which surrender is

requested are covered by the applicable treaty, and (5) there is sufficient evidence to support a finding of probable cause as to each charge for which extradition is requested. *Id.* at 312. *See also In re the Matter of the Extradition of Michael John Drayer*, 190 F.3d 410, 415 (6th Cir. 1999).

Additionally, the evidence relied upon by the Government in support of its request for extradition must be authenticated. *See* 18 U.S.C. § 3190. Once authenticated, that evidence may be relied upon by the Court. *Demjanjuk v. Petrovsky*, 776 F.2d 571, 576 (6th Cir. 1985), *vacated on other grounds* 10 F.3d 338 (6th Cir.1993); *see also Collins v. Loisel*, 259 U.S. 309, 317 (1922).

## III. DISCUSSION

As an initial matter, the Court notes that the parties stipulated during the extradition hearing that the first three elements from *Fernandez* are met in this case. The Court agrees that those undisputed elements are easily satisfied. Accordingly, the Court will limit its discussion to the two remaining *Fernandez* elements and Atkins's objections relative to each.

### A. Fourth Element: Whether the Crimes for Which Surrender is Requested Are Covered by the Treaty

Atkins raises three arguments as to why the fourth *Fernandez* element is not met in this case: (1) the Government failed to demonstrate dual criminality as required by the Treaty, (2) extradition would violate Article 7 of the Treaty, and (3) the statute of limitations provision in Article 5 of the Treaty prevents extradition in this case. (Doc. 27 at 10–14). The Court addresses each argument in turn. Ultimately, however, the Court finds that the fourth *Fernandez* element is satisfied.

#### 1. Dual Criminality

The parties dispute whether dual criminality—that is, that the offense for which extradition is sought is criminal under the laws of both the requesting nation and the refuge nation—is an essential element of the Government's burden of proof to establish a basis for extradition. (Doc.

4

29 at 5–6; Doc. 30 at 5–8). At base, the Government contends that this is not a requirement where, as here, the Treaty enumerates crimes for which "[e]xtradition shall be reciprocally granted[.]" (Doc. 1-1 at 8). The Government reads the Treaty correctly. It invokes dual criminality only as an afternote to the enumerated crimes and as a requirement for charging specifically the participation in crimes (as opposed to the direct commission of crimes). The Treaty states: "Extradition is also to be granted for *participation* in any of the aforesaid crimes or offenses, provided that such *participation* be punishable by the laws of both High Contracting Parties." *Id.* (emphasis added). Here, the offense for which extradition is sought is an enumerated offense. (*Id.*) (listing the applicable crime of "Fraud by a bailee, banker, agent, factor, trustee, director, member, or public officer of any company, or fraudulent conversion."). So dual criminality is not an essential element of the Government's burden.

Regardless, the Government can (and has) established dual criminality. To satisfy dual criminality, the crimes in both countries need not be coextensive in name, nor in scope of liability; rather, the Court must simply determine that "the acts upon which the charges of the requesting country are based are also proscribed by a law of the requested nation[.]" *Demjanjuk*, 776 F.2d at 579. Fraud is a crime throughout the United States. Particularly, the Government proffered that Atkins's alleged conduct would be proscribed by the federal wire fraud statute, 18 U.S.C. § 1343. (Doc. 30 at 7). Additionally, as the Government noted, fraud is criminalized under the Ohio Revised Code. *See, e.g*, Ohio Rev. Code § 2913.02 ("Theft."); § 2913.45 ("Defrauding creditors."); *see generally* ch. 2913 (defining all Theft and Fraud crimes).

Atkins responds that it is insufficient for the Government to identify criminal statutes at a hearing or in briefing. Instead, says Atkins, Singapore should have identified applicable law in its extradition application, or "[a]t a minimum," the Government should have included it in its

5

Extradition Complaint. Atkins cites no law in support of his proposition. And, in fact, courts assessing dual criminality tend to do so at a high level of generality, and upon their own judgment. *See, e.g.*, *Demjanjuk*, 776 F.2d at 579 ("Murder is a crime in every state of the United States. . . . The *act* of unlawfully killing one or more persons with the requisite malice is punishable as murder. That is the test. The acts charged are criminal both in Israel and throughout the United States, including Ohio."); *Oen Yin-Choy v. Robinson*, 858 F.2d 1400, 1405 (9th Cir. 1988) ("The offenses with which Oen is charged, false accounting and publishing a false statement, are listed in the schedule of offenses referred to in Article III of the Treaty. Thus, the Treaty specifically refers to the offenses with which Oen is charged, and the requirement of dual criminality is met. In addition, dual criminality is satisfied because the Hong Kong crimes of false accounting and publishing a false statement are substantially analogous to the federal crime of making a false entry in a bank statement. *See* 18 U.S.C. § 1005."). Thus, even if dual criminality is an essential element here, it is satisfied.

### 2. Article 7

Article 7 of the Treaty provides:

> A person surrendered can in no case be kept in custody or be brought to trial in the territories of the High Contracting Party to whom the surrender has been made for any other crime or offence, or on account of any other matters, than those for which the extradition shall have taken place, until he has been restored, or has had an opportunity of returning to the territories of the High Contracting Party by whom he has been surrendered.

(Doc. 1-1 at 10). In other words, if extradition is certified for one crime, a requesting country may not, after extradition, hold or try an individual for a separate uncertified crime without first returning that individual—or offering that individual the opportunity to return—to his country of refuge. The parties do not dispute the meaning of this provision, but they do disagree on its effect on the current proceedings.

6

Singapore seeks extradition only for "one count of knowingly being a party to the carrying on of a business for a fraudulent purpose, punishable under section 340(5) of the Companies Act." (Doc. 1-2 at 16). The earlier arrest warrant issued for Atkins indicated he was charged with both the offense under the Companies Act, as well as a second offense under the Securities and Futures Act. (Doc. 1-5 at 14). Atkins maintains that this means "Singapore's extradition request is in conflict with its very own warrant on which it is proceeding and the ambiguity contained therein exposes Atkins to undue prejudice . . . ." (Doc. 27 at 14). Yet, Atkins cites no law supporting his contention that extradition cannot be certified because of such a conflict. (*Id.*; *see also* Doc. 29). Nor is the extradition request patently in conflict with Article 7 of the Treaty.

Put simply, Singapore has sought extradition based on only one offense—a violation under section 340(5) of the Companies Act. That offense was included in the arrest warrant and is the only offense for which extradition is now certified. Should Singapore later seek to hold or try Atkins for any other prior alleged offense, without returning him to the United States or offering him the opportunity to return to the United States, it will violate the plain terms of the Treaty. But seeking extradition on a more limited basis than an earlier issued arrest warrant does not violate the Treaty. And any suggestion that Singapore intends to prosecute Atkins on more than the offense contained in the extradition application is pure speculation and cannot serve as grounds for denying certification now.

### 3. Statute of Limitations

Atkins further objects to the certification of extradition, arguing that the applicable statute of limitations has lapsed. (Doc. 27 at 11–13; Doc. 29 at 1–4). The Government responds that neither the applicable statute of limitations of Singapore, nor of the United States, bars extradition. (Doc. 30 at 2–5).

7

> Article 5 of the Treaty says:
>
> The extradition shall not take place if, subsequently to the commission of the crime or offense or the institution of the penal prosecution or the conviction thereon, exemption from prosecution or punishment has been acquired by lapse of time, according to the laws of the High Contracting Party applying or applied to.

(Doc. 1-1 at 9–10). In other words, before certifying extradition, the Court must determine if the statute of limitations of either country has lapsed. It is undisputed that there is no statute of limitations for criminal violations of the Companies Act in Singapore (Doc. 1-2 at 42), so the key inquiry is whether the applicable U.S. statute of limitations has expired.

In the United States, federal non-capital offenses have a five-year statute of limitations unless otherwise enumerated by law, meaning an indictment must be filed within five years of the criminal conduct. 18 U.S.C. § 3282(a). The Government concedes that Atkins's alleged criminal conduct ended by July 2014, and he remains unindicted even now, over eight years later. (Doc. 30 at 2). But that is not the end of the analysis. This Court must consider how criminal proceedings are organized in Singapore, and the record tells us.

Singaporean authorities issued an arrest warrant roughly three years after Atkins's alleged fraudulent conduct. (Doc. 1-2 at 12). The Court must ask whether this step was enough to satisfy the statute of limitations. In the United States, it would not be. But criminal proceedings are not organized in Singapore as they are in the United States. Notably, Singaporean authorities will not charge a fugitive *in absentia*. (Doc. 1-8 at 83) (affidavit from Hon Yi, Deputy Public Prosecutor in Singapore). As such, when a fugitive is not in Singapore, no charge can be brought against him until he is returned to Singapore and appears before the court. (*Id.*). In such situations, one of the options would be for the prosecutor to obtain an arrest warrant for the fugitive from the Singaporean court and then seek to have the warrant enforced by the country where the fugitive is located, *id.*, which is what happened here. Again, the process in the United States is different.

8

The Sixth Circuit has spoken on this very issue of differing criminal processes.  In *Martinez v. United States*, the Circuit emphasized that extradition treaties requiring the satisfaction of statutes of limitation in both the requesting and refuge countries "do[ ] not require us to mix and match national laws by applying [a foreign country's] legal requirements to American limitations periods."  828 F.3d 451, 457 (6th Cir. 2016).  It held that a Mexican arrest warrant was sufficient to satisfy the statute of limitations because Mexico "lacks the sort of indictment and information procedures that exist in the United States."  *Id.* at 456.  Singapore is similar to Mexico in this regard.  Its criminal process lacks the sort of indictment procedures that exist in the United States.  This is enough of a distinction to determine that the valid arrest warrant stopped the statute of limitations from running.  So, like in *Martinez*, the warrant was sufficient to satisfy the statute of limitations.

In response, Atkins seems to say that Singapore should carve out exceptions to its own established criminal charging procedures when faced with defendants who have fled to foreign jurisdictions with more restrictive statutes of limitations.  (Doc. 29 at 3).  The Court does not believe that Singapore must ratify a new treaty or amend its longstanding criminal procedures to extradite a fugitive, who evaded bail conditions and absconded, under a valid arrest warrant.  Rather, the Court credits what the Singaporean prosecutor has represented regarding the need for physical presence to continue with a criminal charge and finds that sufficient for purposes of the Treaty's requirements.

And there is more reason to find the Treaty satisfied.  Even if a Singaporean arrest warrant is insufficient to satisfy the statute of limitations, the Treaty is still satisfied because Atkins's own actions in absconding tolled the five-year statute of limitations period.  Under U.S. law, "[n]o statute of limitations shall extend to any person fleeing from justice."  18 U.S.C. § 3290.  While

9

most courts interpreting this statute "have concluded that a person's mere absence from a jurisdiction" without "proof of the person's intent to avoid anticipated arrest or prosecution" is insufficient to demonstrate flight, *United States v. Florez*, 447 F.3d 145, 150–51 (2d Cir. 2006) (citing cases from the 1st, 2nd, 6th, 7th, 9th, 10th, and 11th Circuits), Atkins has shown more than mere absence.

There is significant evidence that Atkins must have known he would be charged by the Singaporean authorities for alleged criminal behavior in relation to Aureus. It is undisputed that he was interviewed by the authorities six times over a one-month period about Aureus. (Doc. 1-5 at 46). Then, Atkins was arrested in Singapore and released from jail only after agreeing to certain conditions, including turning over his passport and reporting to a bailer. (Doc. 1 at 5–6). And, in view of the foregoing, the Court finds that Atkins knew he would be charged in Singapore.

Further, the Court finds that Atkins fled Singapore to avoid this anticipated prosecution. Shortly after the issuance of bail, Atkins fled. (*Id*. at 7). He traveled to Jakarta, Indonesia, where he applied for a new passport at the U.S. Embassy by lying to U.S. officials and saying he had lost his previous passport. (*Id.*). With that fraudulently obtained passport, Atkins returned to the United States. (*Id.*).

While Atkins suggests that he left Singapore out of fear for his and his family's safety (Doc. 14 at 6), the Court is not persuaded that this was his only intention behind fleeing. Atkins had numerous opportunities to report these alleged threats. He could have told the Singaporean authorities. He could have told Indonesian authorities when he arrived in Jakarta. He could have told U.S. officials at the Embassy in Jakarta. And he had eight years to tell law enforcement about these threats once he arrived in the United States. But the threats remained—and the Court understands that they still remain—unreported. Given these circumstances, the Court finds

10

avoiding prosecution a more likely motivator in Atkins's decision to flee than the alleged threats made against him. Additionally, the fact that Atkins was living openly in the United States does not mean that he was not a fugitive from justice in Singapore. *In re Extradition of Martinez*, No. 3:13-MJ-2042, 2014 WL 199867 at *4 (M.D. Tenn. Jan. 17, 2014) (citing *Man–Seok Choe v. Torres*, 525 F.3d 733, 741 (9th Cir. 2008); *United States v. Fowlie*, 24 F.3d 1070, 1072 (9th Cir. 1994).

Absent an actual admission of his intent to evade prosecution from Atkins, the Court struggles to determine what other evidence would demonstrate flight. It is clear, by a preponderance of the evidence,[1] that Atkins is not only absent from Singapore but intended to avoid arrest or prosecution in his decision to flee and otherwise not attempt to resolve the matter. Accordingly, the requirements in Article 5 of the Treaty are met because Atkins's flight tolled the statute of limitations.

> **B. Fifth Element: Whether There Is Sufficient Evidence to Support a Finding of Probable Cause as to Each Charge for Which Extradition is Requested**

Atkins raises two arguments as to why there is no probable cause in this case: (1) that Singapore is proceeding under an inapplicable criminal statute, and (2) that there is insufficient evidence of Atkins's criminal behavior to establish probable cause. (Doc. 27 at 4–10). The Court will address each of these arguments in turn. Ultimately, the Court finds that the fifth *Fernandez* element requiring probable cause is satisfied.

> **1. Applicability of the Companies Act**

Atkins says that the statute upon which Singapore relies in seeking his extradition—Section 340(5) of the Companies Act—is not applicable to his alleged misdeeds. (*See* Doc. 27 at 4–6,

---

[1] *See United States v. Greever*, 134 F.3d 777, 781 (6th Cir. 1998) (ruling that the Government must prove that the defendant was a fugitive within the meaning of 18 U.S.C. § 3290 by this evidentiary standard).

11

Doc. 29 at 4–5). Atkins reads the Section 340(5) of the Companies Act as criminalizing the intent to defraud creditors in insolvency proceedings, as described in Section 340(1) of the Companies Act. (Doc. 29 at 4). He bases this reading on Section 340(5)'s reference to Section 340(1). (*Id.*). This interpretation, as Atkins argues, is wholly inapplicable to his alleged criminal behavior—defrauding clients during the course of operating a financial investment company. The Court, however, is reluctant to interpret a Singaporean criminal statute utilizing American legal methods.

Instead, the Court relies on the sworn affidavit of Hon Yi—Deputy Prosecutor in the Crime Division of the Attorney-General's Chambers of the Republic of Singapore and much more of an expert in Singaporean criminal code than this U.S. Court. Hon Yi lays out the four elements required to establish a *prima facie* case against Atkins for a criminal violation of "knowingly being a party to the carrying on of a business for a fraudulent purpose" under Section 340(5) of the Companies Act.[2] (Doc. 1-2 at 16, 18–19). None of the elements to "knowingly being a party to the carrying on of a business for a fraudulent purpose" under Section 340(5) of the Companies Act mention insolvency or creditors. (*See id.* at 18–19). The Court is inclined to interpret the applicability of a Singaporean criminal statute to Atkins's alleged conduct consistent with the interpretation set forth by a Singaporean prosecutor. Accordingly, the Court finds the criminal statute for which Singapore seeks Atkins's extradition—Section 340(5) of the Companies Act—applicable to his alleged criminal activity.

---

[2] Hon Yi indicates that, under this statute, the prosecution must prove that:
   a. Aureus Capital was carrying on a business that falsely represented to clients that it would trade in leveraged foreign exchange on their behalf, in return for a share of the profits;
   b. The business had a fraudulent purpose as the clients were deceived into handing money to Aureus Capital by the representation that all their monies, less the bank transfer fees, would be used for leveraged exchange trading;
   c. Most of the monies were in fact not used for leveraged foreign exchange trading; and
   d. Atkins managed Aureus Capital, knowing that its business was to run for the above fraudulent purpose.

(Doc. 1-2 at 18–19). In the sworn affidavit, Hon Yi further asserts that the evidence accompanying the request for his extradition is sufficient to try Atkins for this offense. (*Id.* at 19).

### 2. Sufficiency of the Evidence

The Court must determine only whether there is probable cause to believe that Atkins is guilty of the crime charged. *Fernandez*, 268 U.S. at 312 (1925). Probable cause requires "[a] reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious man in the belief that the person accused is guilty of the offense with which he is charged." *Thacker v. City of Columbus*, 328 F.3d 244, 261 (6th Cir. 2003) (citation and quotations omitted).

Atkins says the evidence of record is insufficient to establish probable cause that: (1) he was Aureus's managing director; (2) he misrepresented the nature of the business to clients; and (3) he was involved in fraudulent dealings on behalf of Aureus. (Doc. 27 at 7–10). At the outset, the Court notes that, through this framing, Atkins has altered the elements of the *prima facie* case, as they are outlined by the Deputy Prosecutor, Hon Yi. Particularly, that *prima facie* case requires that Aureus had a fraudulent purpose to carry on a business that misrepresented to clients it would trade in leveraged foreign exchange on their behalf, collected money from clients for that purpose, and diverted most of that money for a purpose that was not leveraged foreign exchange—and that Atkins managed Aureus with knowledge of its fraudulent intent. (Doc. 1-2 at 18–19). To the extent that Atkins's framing suggests he did not personally make misrepresentations to clients, that is immaterial so long as Aureus did. Similarly, his semantic argument about whether he was a "managing director" of the company is immaterial so long as he managed the company with knowledge of its fraudulent purpose.

Regarding Aureus's fraudulent scheme, Atkins's management of Aureus, and his knowledge of its fraudulent scheme, Singapore has adduced the following evidence:

- Sherlene Tan, the officer charged with investigating Atkins's alleged crimes, found that, "[o]f the total sum of S$18,275,704.81 collected [by Aureus], only

13

> S$1,649,793.08 were transferred to [the foreign exchange trading platform] for the purposes of leveraged foreign exchange trading. A significant portion of the monies collected from its clients was expended in payments to clients as withdrawals, transfers to non-client third parties, or payments to Atkins and [another manager] April, in spite of Aureus Capital's representation that all funds from the clients (less S$40 bank transfer fee) would be used for trading. . . ." (Doc. 1-5 at 48).

- The Government submitted affidavits from former Aureus clients in which they discuss their investments and losses resulting from the fraud scheme. (*See, e.g.*, Docs. 1-7, 1-8).

- Money was disbursed to non-clients from Aureus's bank account, mislabeled as "Client Fund Withdrawal." Recipients of those funds included Atkins's mother ("Mary Atkins," who received S$12,347.20) and his wife ("Pajriah," who received S$298,507.36). (Doc. 1-5 at 49–50).

- Some Aureus clients received a paid commission for referring new clients. (*Id.* at 48).

- Investigating officer Tan further affirmed that: "Investigations revealed that at all materials times, Atkins was the main directing mind behind Aureus Capital." (*Id.* at 47).

- Tan affirmed that another Aureus director, Grullo Myra Dayok, attested that Atkins explained he would be responsible for all management activities. (*Id.* at 47).

- Atkins admitted in an interview with Tan that he was a director of Aureus. (*Id.* at 58).

- Atkins admitted that he was an original shareholder in Aureus, and when the company increased its number of shares, he owned ninety percent of them. (*Id.* at 58).

- Atkins earned the most in salary and expense allowances of any of the directors. (*Id.* at 58–59).

- Atkins admitted he named Aureus. (*Id.* at 59).

- Atkins admitted he was responsible for trading, and for calculating the daily profit and losses arising from Aureus trades and inputting the data into a program to generate the weekly trading statements for clients. (*Id.* at 59–62)

- Atkins admitted to knowingly comingling company money and client money. (*Id.* at 79).

14

All told, there is a reasonable ground for suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious observer to believe that Atkins is guilty of the offense for which Singapore seeks to prosecute him. Therefore, probable cause supports certification for extradition.

## IV. CONCLUSION

For reasons stated above, this Court finds that all the requirements for extradition have been met and Atkins's objections to extradition have no merit. The Court will therefore certify the case to the Secretary of State for further consideration. The Government is to submit a proposed Certification of Extradition and Order of Commitment on or before January 31, 2023, after defense counsel has an opportunity to review it.

IT IS SO ORDERED.


Date:   December 22, 2022                                /s/ Kimberly A. Jolson
                                                        KIMBERLY A. JOLSON
                                                        UNITED STATES MAGISTRATE JUDGE